**In re Leon A. PAUL and Arlene J. Paul, Debtors.**

**Bankruptcy No. 81–234–G.**

United States Bankruptcy Court,
D. Massachusetts.

Nov. 20, 1986.

Dennis J. Brennan, McGuire & McGuire, Worcester, Mass., for debtors Leon & Arlene Paul.

Steve Morad, Morad, Morad & Morad, New Bedford, Mass., for Ajayem Lumber Co.

Steven Kressler, Kressler, Kressler & Pitnof, Worcester, Mass., for Georgia Pacific Corp.

Jack L. Wolfson, Wolfson Moynihan Dodson & Keenan, Worcester, Mass., trustee.

## MEMORANDUM AND ORDER

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

This case presents the question of the effect a bankruptcy filing has upon real estate attachments which are about to expire. Also involved are questions concerning the validity under Massachusetts law of a levy upon a wife's interest as a tenant by the entirety, the valuation of the respective interests of a husband and wife in such a tenancy, and the effect upon the debtors and their creditors of an assignment for the benefit of creditors. These issues arise in the context of competing claims to a surplus resulting from a foreclosure by a bank holding a first mortgage upon the debtors' home.

In 1961, Leon A. Paul and Arlene J. Paul ("Debtors"), who are husband and wife, purchased as their principal residence a home in Winchendon, Massachusetts as tenants by the entirety. On April 17, 1975, the Debtors mortgaged the property to Winchendon Savings Bank (the "Bank"). Thereafter attachments were made against the respective individual interests of the Debtors. For clarity we will first set forth those affecting the interest of Leon J. Paul. On June 17, 1975, Georgia Pacific Corporation ("Georgia Pacific") recorded an attachment in the registry of deeds in the sum of $20,000 against the interest in this real estate held by Leon A. Paul. On June 20, 1975, C & S Lumber Company, Inc. ("C & S Lumber") recorded a $4,000 attachment against the interest in the property held by Leon A. Paul.

Also on June 20, 1975, only hours after the C & S Lumber attachment was recorded, the Debtors conveyed the property to Weymouth B. Whitney (the "Assignee") as assignee for the benefit of creditors. The Assignee thereafter did nothing with the property.

On October 13, 1978, Ajayem Lumber Company ("Ajayem") recorded a $7,000 attachment against the interest of Arlene J. Paul in the property. Ajayem thereafter obtained judgment and execution against Arlene J. Paul and on October 18, 1979 it recorded its execution in the amount of $8,558.55. On April 28, 1980, Ajayem held a sheriff's sale on its levy and on that day purported to purchase the interest of Arlene J. Paul in the property for $8,558.55, subject to any prior encumbrances, receiving a sheriff's deed which was recorded on May 27, 1980.

On March 30, 1981, the Debtors filed with this Court a petition requesting relief under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 701 *et seq.* Thereafter the Bank obtained termination of the automatic stay and held a foreclosure sale under its first mortgage. This sale produced a surplus of $23,422.25. At the request of the Bank and after notice to the Assignee, Ajayem, Georgia Pacific, the Chapter 7 trustee and the Debtors, the Court ordered that this surplus be transferred to the

trustee in bankruptcy (the "Trustee") to be held and distributed by him as later determined by the Court. Ajayem, Georgia Pacific and the Debtors all make claims against the fund. The Trustee has applied to this Court to be paid $2,025 from the fund as compensation for services which consisted, for the most part, of dealings with the Bank and the other parties claiming an interest in the property or its proceeds. The Trustee has taken no independent position as to distribution of the fund.

### I. *Expiration of Real Estate Attachments*

Under MASS.GEN.L. ch. 223, § 114A, an attachment on real estate expires six years after it is recorded in the local registry of deeds unless, within that period, the attaching creditor requests the register of deeds to extend the attachment for an additional six years.[1] Neither Georgia Pacific nor C & S Lumber requested such an extension of its attachment. Ajayem argues that the bankruptcy filing on March 30, 1981 did not toll the running of the statutory six year period, so that these creditors lost their attachments on the Debtor's property by neglecting to renew the lien. For the reasons stated herein, we hold that the time period under MASS.GEN.L. ch. 223, § 114A was tolled by the filing of the bankruptcy petition on March 30, 1981.

The problem presented in this case is analogous to the issue of whether a creditor's time within which to file a continuation of a financing statement is tolled by the automatic stay in bankruptcy (11 U.S.C. § 362). In many states, including Massachusetts, the question is easily resolved by the 1972 version of U.C.C. § 9–403(2), which expressly provides that a security interest remains perfected during insolvency proceedings if it is perfected at the time of the commencement of the proceedings. This is true regardless of whether the secured party's perfection would lapse during the insovency proceedings because of the failure to file a continuation statement.[2] *See* MASS.GEN.L. ch. 106, § 9–403(2).

In other states, however, the predecessor of § 9–403(2) is in force. The 1962 version of the statute does not address the effect of a bankruptcy petition on the secured party's obligation to file a continuation statement.[3] Thus, secured creditors in

---

1. MASS.GEN.L. ch. 223, § 114A (1986) reads as follows:

   An attachment of land, or of a right or interest therein, shall, unless otherwise dissolved, expire by operation of law at the end of six years from the date of filing the same in the office of the register of deeds in the county or district where said land or some part of it is situated, unless said register shall, within said period, at the written request of the plaintiff or his attorney bring forward the same upon the books of attachments. At the expiration of six years from the time of any such first or subsequent bringing forward, such attachment shall expire as aforesaid unless within such period it is again brought forward in like manner. The register shall record every such written request in his office and shall be entitled to the same fee for bringing forward each such attachment upon the books where such attachments are recorded as for the original entry thereof in such books.

2. U.C.C. 9–403(2) (1972 version) reads as follows:

   [A] filed financing statement is effective for a period of five years from the date of the filing. The effectiveness of a filed financing statement lapses on the expiration of the five year period unless a continuation statement is filed prior to the lapse. If a security interest perfected by filing exists at the time insolvency proceedings are commenced by or against the debtor, the security interest remains perfected until termination of the insolvency proceedings and thereafter for a period of sixty days or until expiration of the five year period, whichever occurs later. Upon lapse the security interest becomes unperfected, unless it is perfected without filing. If the security interest becomes unperfected upon lapse, it is deemed to have been unperfected as against a person who became a purchaser or lien creditor before lapse.

3. Before 1972, § 9–403(2) read as follows:

   A filed financing statement which states a maturity date of the obligation secured of five years or less is effective until such maturity date and thereafter for a period of sixty days. Any other filed financing statement is effective for a period of five years from the date of filing. The effectiveness of a filed financing statement lapses on the expiration of such sixty day period after a stated maturity date or on the expiration of such five year period, as the case may be, unless a continuation statement is filed prior to the lapse. Upon

some jurisdictions (and the attaching creditors here) are faced with a dilemma when a petition is filed a short time before their interests lapse. The automatic stay prevents them from taking any further action to perfect their lien, but the same stay may not stem the advance of time which threatens to extinguish the perfection of their security interests existing at the time of the petition.

One court has held that the automatic stay does not stop the clock from ticking on the obligation to file continuation statements under the 1962 version of § 9–403(2). *Eastern Indiana Production Credit Association v. Farmers State Bank*, 31 Ohio App.2d 252, 287 N.E.2d 824 (1972). This case, however, lacks analysis or visible support for its result. The court in *Eastern Indiana PCA* based its decision on the assertion that "state law exclusively governs the priority of lines in the case." *Eastern Indiana PCA*, 31 Ohio App.2d at 254, 287 N.E.2d at 826. Policies behind the bankruptcy stay and § 9–403(2) were not considered, nor did the court consider the effect of a bankruptcy petition on the rights of secured creditors.

A majority of cases have looked closely at the interplay between the 1962 version of § 9–403(2) and the automatic stay, and have concluded that the time period is tolled. *E.g., United States v. Freeland (In re Chaseley's Foods, Inc.)*, 30 B.R. 452 (N.D.Ind.1983), *aff'd.* 726 F.2d 303 (7th Cir. 1983); *Bond Enterprises, Inc. v. Western Bank of Farmington (In re Bond Enterprises, Inc.)*, 54 B.R. 366 (Bankr.D.N.M. 1985); *In re Funding System Asset Management Corp.*, 38 B.R. 351 (Bankr.W. D.Pa.1984); *Old Stone Bank v. South County Motel Corp. (In re South County Motel Corp.)*, 19 U.C.C. Rep.Serv. (Callaghan) 1254 (Bankr.D.R.I.1976). These cases emphasize consideration of two policies: (1) the automatic stay's goal of freezing all rights and priorities at the time of the filing of the petition; and (2) the notice

such lapse the security interest becomes unperfected. A filed financing statement which states that the obligation secured is payable

filing goals in the U.C.C. Both of these policies are relevant here.

■ One of the primary goals of the automatic stay is to sort out creditors into an order of priority untainted by post-petition jockeying for position. Congress has stated that the automatic stay gives protection to both the debtor and the creditors. H.R.REP. NO. 595, 95th Cong., 1st Sess. 340 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6297. Without the stay,

> [C]ertain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.

H.R.REP. NO. 595 at 340, U.S.Code Cong. & Admin.News p. 6297. The intended effect of the stay, therefore, is to fix rights and priorities as of the time of petition filing and to prohibit any further acts to advance those rights and priorities.

The stay not only fixes priorities, but also protects them. The Supreme Court in *Isaacs v. Hobbs Tie and Timber Co.*, 282 U.S. 734, 51 S.Ct. 270, 75 L.Ed. 645 (1931), stated that "valid liens existing at the time of the commencement of a bankruptcy proceeding are preserved...." *Id.* at 738, 51 S.Ct. at 272. The Second Circuit has held that the effect of filing a petition is a two way street for creditors and debtors: "[I]n general no creditors' liens acquire validity after the filing of the petition ... It should equally follow, we believe, that liens good at this time do not lose their validity...." *Lockhart v. Garden City Bank & Trust Co.*, 116 F.2d 658, 661 (2d Cir.1940). The freezing of priorities is consistent with the needs of the automatic stay. Just as a creditor's actions after the petition will not affect the priority of other creditors'

on demand is effective for five years from the date of filing.

claims, his inaction during the stay should not affect his own priority. To hold otherwise would encourage the unequal "race of diligence" Congress wanted to avoid.

Because state law determines validity, however, a court must also determine whether tolling time on a creditor's claim is consistent with state goals of notice to other creditors. *See* MASS.GEN.L. ch. 223, § 63; *cf.* J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE § 23–5 (2d ed. 1980). Most of the cases interpreting U.C.C. § 9–403(2) in conjunction with the automatic stay have held that the stay's suspension of the time for filing a continuation statement is consistent with the notice concerns of the U.C.C. *E.g., United States v. Freeland (In re Chaseley's Foods, Inc.),* 30 B.R. 452, 456–57 (M.D.Ind.1983). Filing a continuation statement after a bankruptcy petition is futile because the security interest was perfected at the time of the petition and further notice is unnecessary.

The only parties which can possibly be injured by failure to file a continuation statement once a bankruptcy proceeding is pending are creditors who obtain their liens after the financing statement expires. However, because the trustee takes possession of the debtor's property once a petition is filed, and this possession is open and notorious, these creditors should not need the protection of a continuation statement.

*United States v. Freeland (In re Chaseley Foods, Inc.),* 30 B.R. at 455. If the state concern for creditor protection through notice is not satisfied, however, the automatic stay might cause an inequitable result if it tolled the time within which the creditor must provide such protection. *Borg-Warner Acceptance Corp. v. Twelves (In re Utah Agricorp, Inc.),* 12 B.R. 573 (Bankr. D.Utah 1981) (obligation to perfect security interest under U.C.C. § 9–103(1)(d) within four months after the collateral is moved into another jurisdiction is not tolled by the automatic stay. Creditors within the new jurisdiction would have no notice of the prior lien before the petition if no new financing statement is filed). With this background, we now turn to the facts of this case.

■ We conclude that the time which Georgia Pacific and C & S Lumber had to renew their attachments under MASS. GEN.L. ch. 223, § 114A was tolled by the Debtors' petition. As we have stated, the general rule is that the validity of a creditor's claim should be determined as of the time of the petition without reference to subsequent events. Ajayem points out that a majority of courts have held that the automatic stay does not toll the time within which a debtor may redeem a mortgage debt under state law. Ajayem argues that the same rule should apply in this situation. If one carefully reads the decisions cited by Ajayem, however, it becomes clear that the courts' holdings are based, at least in part, on 11 U.S.C. § 108(b), which allows a debtor or trustee to cure defaults within the time provided by state law or sixty days, whichever is later. *See Martinson v. First National Banks of Oakes (In re Martinson),* 731 F.2d 543, 544 (8th Cir.1984); *Johnson v. First National Bank of Montevideo,* 719 F.2d 270, 277–78 (8th Cir.1983); *Westergaard v. Cucumber Creek Development, Inc. (In re Cucumber Creek Development, Inc.),* 33 B.R. 820, 822 (D.Col. 1983). No similar statutory provision exists in this situation. In addition, the cases cited by Ajayem are distinguishable on the grounds that they consider a debtor's redemption rights, not the priorities of creditors.

The case at bar involves creditors' claims and priorities, not a debtor's right to cure a default. There is no express provision in the Bankruptcy Code which allows a creditor to take acts in order to continue the perfection of its lien. In fact, § 362(a)(4) arguably forbids such acts.[4] *Bond Enterprises, Inc. v. Western Bank of Farming-*

---

**4.** 11 U.S.C. § 362(a)(4) operates as a stay on "any act to create, perfect, or enforce any lien against the estate."

*ton (In re Bond Enterprises, Inc.),* 54 B.R. 366, 368–69 (Bankr.D.N.M.1985). All of the attachments were perfected at the time the Debtors filed for bankruptcy on March 30, 1981. The policy of the automatic stay obligates this Court to put on blinders and focus on that date for the purpose of determining validity and priority of their lien.

All state notice concerns are satisfied here. The attachments of Georgia Pacific and C & S Lumber were recorded in the Worcester County Register of Deeds pursuant to MASS.GEN.L. ch. 223, §§ 63–66. At the time of the petition, any creditor could search the records, find the attachments, and deduce that they were still valid. The March 30, 1981 petition obviated any need for further notice to or protection for potential creditors by vesting all of the Debtors' property in the bankruptcy estate. Continuation or renewal of any of the attachments after that time would be "futile, an idle gesture, [and] ceremonial in character...." *Chicago Gravel Co. v. Howard (In re Lake County Fuel & Supply Co.),* 70 F.2d 391, 392 (7th Cir.1934) (judgment creditor not required to preserve lien under Illinois law by executing it in order to avoid expiration after bankruptcy petition filed); *see Limperis v. First National Bank of Geneva (In re Phillips Construction Co., Inc.),* 579 F.2d 431 (7th Cir.1978) (mechanic's lien did not expire after date of bankruptcy petition despite state statute setting time limit for pursuit of claim).

In light of the foregoing, we conclude that the attachments of Georgia Pacific and C & S Lumber did not expire by operation of MASS.GEN.L. ch. 223, § 114A after the Debtors filed their joint petition on March 30, 1981. We now turn to the claims of all of the creditors to the proceeds held by the Trustee.

## II. *Rights in the Proceeds*

Each of the creditors competing for the funds held by the Trustee holds a claim only against either Mr. Paul or Mrs. Paul. None holds a claim against both of the Debtors, and none claims to succeed to the joint interest of Mr. and Mrs. Paul. In order to determine the validity and value of these claims, it will first be necessary to determine the Assignee's rights under the deed to him. We will then determine the nature and value of the respective property interests of Mr. and Mrs. Paul, and of Ajayem as a purchaser at the execution sale. Finally, we will determine how the proceeds in the Trustee's hands should be distributed. The Court notes that many of the legal principles discussed here have not been argued by the attorneys involved in this case. In order to decide rights in these proceeds, the Court was obligated to consider the record as a whole and rely on its research in areas of the law not suggested by the attorneys in their arguments.

### A. *The Assignee's Interest*

■ We conclude that the Assignee has no rights in the fund held by the Trustee. The Assignee, in a prior adversary proceeding in this case, had intervened and claimed title to the real estate. The Court dismissed that adversary proceeding after it had granted the Bank relief from the automatic stay for purposes of foreclosing on the real estate. *Ajayem v. Paul,* Adv. No. 81–0186 (Bankr.D.Mass. April 2, 1984) (order dismissing proceeding). After the foreclosure sale, the Bank moved to remit the excess funds received to the Trustee. The Assignee, despite notice, did not object to that motion nor did it appeal from the order granting the Bank's motion on July 23, 1984. The Assignee, despite notice, has also failed to object to motions by both Ajayem and Georgia Pacific to disburse the funds held by the Trustee.

We conclude, therefore, that the funds became property of the estate and that the Assignee, through his failure to assert his rights, waived any claim he might have to title to those funds. Although the Assignee might have contested the turnover under 11 U.S.C. § 543(d), he took no steps to do so, and, in effect, has conceded that the funds are property of the estate. We do not hold, however, that the assignment was void, as the Debtors asserted in the adversary proceeding. We merely conclude that the Assignee, through his inaction, is barred from claiming title to the funds.

## B. *Debtors' Rights*

■ Although the Debtors did not list the Winchendon residence in the asset portion of their bankruptcy schedules, they have claimed a joint exemption of $13,000 in the property. They arrive at the $13,000 by deducting the Bank's mortgage of $24,000 from the $37,000 valuation which they placed on the property.

We conclude that the Debtors have an interest as tenants by the entirety in the proceeds held by the Trustee. The Bank's motion to transfer the foreclosure surplus to the Trustee, and the Trustee's cooperation in that motion, was the equivalent of a turnover proceeding by the Trustee against the Assignee under 11 U.S.C. § 543(d). If the Assignee had asserted his rights and lost in turnover litigation, the Court's only rationale for the turnover would have been that the residence was the property of the Debtors.[5] The Assignee, through his failure to assert his rights, in effect has conceded that the funds are the property of the Debtors. The Debtors, therefore, take the same interest in the funds as they had before they transferred the property to the Assignee: a tenancy by the entirety.

While the extent of the Debtors' interest at the time of their petition was unclear when they filed, the Assignee's abandonment of his rights removes the doubt. The tenancy by the entirety survived the assignment for the benefit of creditors and characterized the property throughout the assignment. The Debtors' ownership interests were transferred to the surplus resulting from the Bank's foreclosure, so that they retain the same interest in the funds.

*Smith v. Tipping,* 349 Mass. 590, 211 N.E.2d 231 (1965); *Ronan v. Ronan,* 339 Mass. 460, 159 N.E.2d 653 (1959).

Because the nature of the Debtors' interest as tenants by the entirety affects the other interests in the property, we must further analyze that interest. Under Massachusetts common law, a wife had no present interest whatsoever in a tenancy by the entirety. The husband alone had the right to possession of the property and he alone could transfer a property interest during their joint lifetimes. The wife's only property interest was the right to own the entire property if she survived her husband. For this reason a wife's interest in a tenancy by the entirety was not subject to attachment or levy by her creditors. *Pineo v. White,* 320 Mass. 487, 490–91, 70 N.E.2d 294, 297 (1946); *Licker v. Gluskin,* 265 Mass. 403, 407, 164 N.E. 613, 615 (1929). This rather unequal division of property interests was the product of the antiquated notion that husband and wife are one, and that "one" is the husband. *See* Lavien & Mencher, *The Eclipse of Massachusetts Tenancy by the Entirety and a Reappraisal of Homestead as They Relate to Bankruptcy,* 67 MASS.L.REV. 170 (1982).

The Massachusetts legislature has sought to correct this inequality by St.1979, C. 727, amending G.L. 209, § 1.[6] The statute does not apply, however, to tenancies by the entirety created prior to February 11, 1980. *Turner v. Greenaway,* 391 Mass. 1002, 459 N.E.2d 821 (1984). Although the common law incidents of a tenancy by the entirety raise grave constitu-

---

5. The Court is aware that 11 U.S.C. § 543(d)(2), enacted in 1984, protects an assignee for the benefit of creditors from turnover unless turnover is necessary to prevent fraud or injustice. Although the Assignee here would seem to be protected under that provision, the amendment *only* applies to cases filed after October 10, 1984. Pub.L. 98–353, § 553(a), 98 Stat. 392 (July 10, 1984); *Creasy v. Coleman Furniture Corp.,* 763 F.2d 656, 660 (4th Cir.1985). Because the Debtors filed this case in 1981, the 1984 provision does not apply here.

6. St.1979, C. 727 added the following two sentences to G.L. c. 209, § 1:

A husband and wife shall be equally entitled to the rents, products, income or profits and to the control, management and possession of property held by them as tenants by the entirety. The interest of a debtor spouse in property held as tenants by the entirety shall not be subject to seizure or execution by a creditor of such debtor spouse so long as such property is the principal residence of the non-debtor spouse; provided, however, both spouses shall be liable jointly and severally for debts incurred on account of necessaries furnished to either spouse or to a member of their family.

tional questions under the equal protection clauses of both the federal and Massachusetts constitutions, the Supreme Judicial Court of Massachusetts has also held that these apparent infirmities do not apply to pre-existing tenancies by the entirety. *West v. First Agricultural Bank,* 382 Mass. 534, 419 N.E.2d 262 (1981).

Valuation of the husband's exclusive right to income during his lifetime, and valuation of the parties' respective survivorship rights, would normally involve actuarial matters not placed into evidence. However, it is unnecessary to become embroiled in such evidence. Under U.S.C. § 522(b) the Debtors had the choice of claiming either (i) the exemptions granted by that section or (ii) any other exemption granted by federal or state law plus "any interests in property which the debtor had, immediately before the commencement of the case, an interest as a tenant by the entirety or joint tenant to the extent that such interests as a tenant by the entirety or joint tenant is exempt from process under applicable nonbankruptcy law." 11 U.S.C. § 522(b)(2)(B). In their schedules filed with the Court, the Debtors chose the federal exemptions granted by § 522. They reported the property at a value of $37,000, and claimed as exempt the entire $13,000 equity remaining after the Bank's mortgage debt, which was scheduled at $24,000. By so doing, Mrs. Paul elected not to avail herself of the exemption afforded her property interest by the common law rule prohibiting attachment of that interest. It would be inconsistent with this election to value her interest, or that of Mr. Paul, based upon its common law incidents. Valuation based upon equality of their respective rights, including the right of partition, seems much more appropriate in these circumstances.

We therefore conclude that the value of each of the Debtor's interest in the property is 50% of their total claimed exemption of $13,000, subject to whatever ownership rights are held by Ajayem. We now turn to Ajayem's interest.

### C. *Ajayem's Rights as Purchaser and Attaching Creditor of Mrs. Paul's Interest*

We conclude that Ajayem's purported purchase of Mrs. Paul's interest at the execution sale was void. As discussed, Mrs. Paul's interest as a tenant by the entirety survived the assignment for the benefit of creditors. She has not waived her claim to an ownership interest as a tenant by the entirety. Both Debtors pressed their claim to ownership and their federal exemption at the hearing. They have not, therefore, waived their rights as tenants by the entirety to a declaration that the sale of the wife's interest to Ajayem through a sheriff's sale was void. The sale or transfer of a wife's interest in a tenancy by the entirety pursuant to a levy is not sufficient to transfer title to the property. *See Krokyn v. Krokyn,* 378 Mass. 206, 390 N.E.2d 733 (1979); *Licker v. Gluskin,* 265 Mass. 403, 407, 164 N.E. 613, 615 (1929). Because this property interest is not subject to levy and sale, it is unnecessary to address the parties' arguments concerning alleged improprieties in the conduct of the sheriff's sale.

Because the Debtors elected federal exemptions, however, they cannot void Ajayem's attachment on Mrs. Paul's interest through the state common law exemption. Mrs. Paul's right to avoid a levy by sale and her right to avoid an attachment are different incidents of her tenancy which go to separate rights in the property. Invalidating a levy protects the wife's dormant ownership rights in the property. A common law tenancy by the entirety consists of an active ownership by the husband and a passive ownership in the wife. The wife's interest—a survivorship interest—is inviolable by her creditors. Her "expectancy of title is neither alienable nor subject to execution by her sole creditors." *Krokyn v. Krokyn,* 378 Mass. 206, 211, 390 N.E.2d 733, 736 (1979).

Mrs. Paul's right to avoid attachments, while arising from some of the same incidents of ownership, nevertheless protects her expectancy of title from taint rather

than from destruction. An attachment merely creates a lien on her equity and does not immediately threaten her title. A creditor must go through the additional steps of recovering a judgment, recording an execution, recording a levy, and enforcing the levy. *See generally* MASS.GEN.L. ch. 235, ch. 236. The difference is essentially the difference between placing a lien on the estate and foreclosing on the lien.

Mrs. Paul's only recourse, therefore, is under the federal exemption granted by § 522(f)(1), which allows her to avoid judicial liens to the extent that they impair her federal exemption. As discussed later, the proceeds available are more than enough to accommodate the Debtors' federal exemptions and still satisfy at least part of Ajayem's attachment. Ajayem's attachment, therefore, is still valid to the extent it does not impair the exemption of Mrs. Paul.

### D. *Debtor's Claims to Federal Exemption, Fees of Counsel to the Debtors*

■ The Debtors are entitled to $6,500 each under their total federal exemption claim of $13,000. Because the proceeds are property of the estate, they may take their exemptions from the funds held by the Trustee. 11 U.S.C. § 522(b).

Counsel to the Debtors has requested compensation in the sum of $2,062.50. This sum represents the reasonable value of the services performed on behalf of the Debtors in obtaining their exemption in the property. The Trustee shall pay this compensation from the Debtors' $13,000 exemption, one-half from Mr. Paul's $6,500 exemption and one-half from Mrs. Paul's $6,500 exemption. *See* 11 U.S.C. § 522(k).

### E. *The Trustee's Fee*

■ Under 11 U.S.C. § 506(c), a trustee "may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." The services of the Trustee's counsel related primarily to his position as stakeholder for the secured claimants. The secured claimants have benefited from these services to the extent of the requested compensation. Counsel to Trustee is accordingly entitled to be compensated from the collateral in the sum of $2,025, the amount requested.

### F. *Valuation of Interests of Georgia Pacific, Ajayem and C & S Lumber*

Portions of the briefs were devoted to arguments related to which creditors have and have not filed secured claims. Whether or not a creditor files a secured claim, however, is irrelevant. To the extent a claim is secured, it remains secured throughout the case even though no proof of claim is filed. 11 U.S.C. § 506(d).

It follows from this, and from all that has been said previously, that Georgia Pacific is entitled to the balance of Mr. Paul's 50% interest after deducting Mr. Paul's $6,500 exemption and after deducting one-half of the fee of counsel to the Trustee.

Because the Georgia Pacific claim of $25,000 cannot be paid in full, there is no collateral remaining for C & S Lumber. Its claim is therefore valued at zero.

It also follows that Ajayem is entitled to the balance of Mrs. Paul's 50% interest after deducting Mrs. Paul's $6,500 exemption and after deducting one-half of the fee of counsel to the Trustee. Although the Ajayem claim pursuant to its attachment is only $8,558.55, it will also consume the balance of this 50% interest without being paid in full.

SO ORDERED.