In re HALMAR DISTRIBUTORS,
INC., et al., Debtors.

GENERAL ELECTRIC COMPANY,
Appellant,

v.

HALMAR DISTRIBUTORS,
INC., et al., Appellees.

No. 91–2017.

United States Court of Appeals,
First Circuit.

Heard March 5, 1992.
Decided July 8, 1992.

George F. Parker, III with whom Audrey LaRowe Nee and Badger, Dolan, Parker & Cohen, Boston, Mass., were on brief for General Elec. Co.

Charles R. Bennett, Jr. with whom Kevin J. Simard and Riemer & Braunstein, Boston, Mass., were on brief for appellee BayBank Middlesex.

Before TORRUELLA, Circuit Judge, WEIS,* and BOWNES, Senior Circuit Judges.

WEIS, Circuit Judge.

This appeal addresses a bankruptcy judge's allocation of priorities between two secured creditors and dismissal of a claim for conversion. We conclude that a petition for bankruptcy tolls the four-month period for filing a new financing statement that must be filed when secured property is transferred into a state. We also determine that until it affirmatively disavows its previous acquiescence in the practice, a senior secured creditor may not prevail in a conversion claim against a junior secured creditor for receipt of proceeds from sales of secured goods. We will accordingly reverse in part and affirm in part a district court order sustaining a bankruptcy judge's order adverse to the senior secured creditor.

The orders at issue here arose out of an adversary proceeding filed by General Electric in a Chapter 11 proceeding instituted on October 16, 1989, by Halmar Distributors, Inc. and Ralar Distributors, Inc. in the District of Massachusetts.

Halmar is a Massachusetts wholesaler that distributed merchandise including products manufactured by General Electric. That company retained a security interest in much of the inventory it sold to Halmar and filed financing statements with the appropriate Massachusetts authority.

General Electric also had filed appropriate financing statements in New York, perfecting a security interest in the inventory it had sold to Ralar, Halmar's affiliate, which did business in that state. In July 1989, however, Ralar transferred all of its inventory to Halmar's warehouse in Massachusetts. General Electric did not at that time file a financing statement in that state.

Until early 1989, Halmar and Ralar had maintained a revolving credit arrangement with Shawmut Bank, N.A., a Massachusetts financial institution. On March 27, 1989, they began a similar financing arrangement with BayBank. The bank made loans to the debtors in amounts determined by a formula based on the levels of current inventory and accounts receivable.

BayBank required that the debtors' customers make their payments directly to a lockbox under the control of the bank. Money thus received was applied to the amounts owed to the bank by the debtors. Periodically, the bank advanced new funds to the debtors who in turn were authorized to use the money in the general course of their business, including paying creditors.

Baybank also obtained a security interest in all of the debtors' inventory and filed financing statements in Massachusetts and

---

* Of the Third Circuit, sitting by designation.

New York in March 1989. The bank was on notice of General Electric's prior security interests.

In September 1989, General Electric learned that the debtors' revolving credit arrangement was in force with BayBank. On October 13, 1989, three days before the bankruptcy petition in this case was filed, General Electric sent a letter to BayBank objecting to the collection of Halmar's receivables through the lockbox, specifically the sums attributable to sales of General Electric products.

After the bankruptcy administration began, General Electric filed this adversary proceeding seeking to enforce its security rights in inventory, proceeds, and accounts receivable. BayBank intervened to protect its interest.

The bankruptcy court ordered BayBank to place in escrow the proceeds of all the debtors' sales of General Electric products that occurred after September 15, 1989. Amounts received from BayBank's foreclosure sales of General Electric goods in the debtors' inventory were to be included in the escrow account.

The escrow account now contains the proceeds from sale of bulbs, lamps, batteries, and wiring devices. The bankruptcy court found that the financing statements filed against Halmar covered lamps and bulbs, and thus General Electric had a priority interest in the proceeds from sales of those items. However, because those financing statements did not include wiring devices and batteries, the bank's security interest had priority on those items.

The bankruptcy court further decided that General Electric had lost its priority status as to the Ralar inventory because of a failure to file financing statements within four months after those goods had been moved into Massachusetts.

Consequently, General Electric was adjudged to have a priority interest only in the proceeds from the sales of Halmar's lamps and bulbs. Baybank was awarded priority as to the remaining General Electric products.

The bankruptcy court rejected General Electric's conversion claim, which was based on allegations that the bank had improperly reimbursed itself from payments in the lockbox attributable to purchases of General Electric products. 116 B.R. 328. The court reasoned that General Electric had not restricted the debtors in their use of proceeds from the sale of its products—General Electric's agreements with the debtors "required payment only under credit terms and not by in-kind remittance of proceeds." Additionally, the bankruptcy judge concluded that the lockbox arrangement was in the ordinary course of business. Finally, the bankruptcy judge asserted that General Electric was guilty of laches in not asserting its rights at an earlier time. The district court affirmed, agreeing that General Electric had acquiesced in the bank financing procedures.

General Electric has appealed, arguing that the four-month period to file the financing statement as to the Ralar inventory was tolled by the bankruptcy filing. General Electric maintains, therefore, that it retained its security interest in Ralar's inventory, which included wiring devices and batteries. In addition, General Electric asserts that Baybank, by its use of the lockbox, converted payments for General Electric products. Finally, General Electric contends that its security interest extended to proceeds and inventory in addition to that which the bankruptcy court awarded.

The controversy between General Electric and BayBank is divided into two areas—the respective priorities of the two security holders and, second, the conversion claim. We will address the issues in that order.

I.

The financing statement General Electric filed to secure an interest in Halmar's inventory establishes a priority interest in the goods that are listed. Batteries and wiring devices were not covered by the filing. As to these items, the bank gained priority because of its more expansive description of the goods in its financing state-

ment. The bankruptcy court properly concluded that the Bank held a priority interest in Halmar's inventory as to products that General Electric did not list in its financing statement.

■ The situation with respect to Ralar's inventory, however, is more complex. In the New York financing statement applicable to that company, General Electric included wiring devices and batteries, as well as lamps and bulbs.

Generally speaking, when a debtor transfers property from one state to another, the Uniform Commercial Code requires the security holder to file a new financing statement in the transferee state within four months. Mass.Gen.L. ch. 106, § 9–103(1)(d). In this case, the bankruptcy judge found as a fact that Ralar's entire inventory, including General Electric products, arrived in Massachusetts by July 3, 1989. General Electric did not file a financing statement covering that inventory in Massachusetts until November 7, 1989, some four days beyond the four-month period.

The bankruptcy judge rejected General Electric's argument that Ralar's bankruptcy filing tolled the four-month period. He observed that the Uniform Commercial Code provision, Mass.Gen.L. ch. 106, § 9–103(1)(d), was intended to protect creditors in Massachusetts who might not have received notice of an out-of-state security interest despite the bankruptcy filing.

The bankruptcy judge reasoned that when property was transferred from one state into another, potential creditors would not know in which part of the country the property had originated and where financing statements might be on file. He therefore held that the bank had the priority interest in Ralar's inventory.

In arriving at that conclusion, the bankruptcy judge did not take into account several factual matters that we believe are material. The documents establishing the revolving credit agreement reveal that Bay-Bank was aware of the interlocking relationship between Halmar and Ralar. Moreover, the bank was on notice of General Electric's security interest in Ralar inventory, but proceeded with the arrangement nevertheless. Indeed, BayBank also filed a financing statement in New York in March 1989.

In October 1989, during the four-month grace period, General Electric had sent formal notice of its security interests to Bay-Bank and expressed dissatisfaction with the revolving credit agreement. In addition, General Electric filed an adversary proceeding in the bankruptcy court on October 23, 1989, in which the bank intervened.

Like many matters in the bankruptcy courts, the dispute here is governed by state law—in this instance the Uniform Commercial Code as adopted in Massachusetts.

In pertinent part, section 9–103(1)(d) provides that "[w]hen collateral is brought into and kept in the commonwealth while subject to a security interest perfected under the law of the jurisdiction from which the collateral was removed, the security interest remains perfected," but if refiling does not occur "before ... the end of four months after the collateral is brought into the commonwealth, ... the security interest becomes unperfected at the end of that period and is thereafter deemed to have been unperfected as against a person who became a purchaser after removal." Mass. Gen.L. ch. 106, § 9–103(1)(d)(i) & (ii).

No on-point cases from the appellate courts of the commonwealth have been called to our attention, nor have any been uncovered by our independent research. We have found only a limited number of opinions from other jurisdictions that have been informative.

As in many instances of statutory interpretation, the question for the court is whether the statute should be interpreted literally or liberally. Arguments are not wanting on either score. Because the Uniform Commercial Code sets standards for business dealings, the argument for plain meaning and narrow construction is strong. On the other hand, the Code itself provides that it is to be liberally construed and applied to promote its underlying purposes

and policies. Mass.Gen.L. ch. 106, § 1–102(1).

This issue of construction has divided the distinguished authors of a treatise on the Uniform Commercial Code. Professor White believes that it is "[b]etter to leave an occasional widow penniless by the harsh application of the law than to disrupt thousands of other transactions by injecting uncertainty and by encouraging swarms of potential litigants and their lawyers to challenge what would otherwise be clear and fair rules." Professor Summers, on the other hand, acknowledges that the application of equitable principles tends to make priority law less certain, but maintains that it nevertheless offers flexibility in cases where applying the Code rigorously may result in an unfair outcome. *See* 2 James J. White & Robert S. Summers, Uniform Commercial Code § 26–20, at 554–55 (3d ed. 1988); *see also* Steve H. Nickles, *Rethinking Some U.C.C. Article 9 Problems,* 34 Ark.L.Rev. 1 (1980). We will follow the Code's directives to construe its provisions liberally.

In *First Nat'l Bank v. John Deere Co.,* 409 N.W.2d 664, 666 (S.D.1987), the state supreme court stated that, based on the circumstances, "a close analysis of the purposes behind the four-month rule and the positions held by [the] parties [was] necessary." The Court observed that the four-month rule was designed to "protect creditors from absconding debtors," and was not intended to "protect a party ... who was not an innocent third-party purchaser after removal, but was instead an original seller and secured party located in another state who was involved before removal." *Id.* (citing *In re Automated Bookbinding Serv.,* 471 F.2d 546 (4th Cir.1972)). The court cited with approval 8 Ronald A. Anderson, *Uniform Commercial Code* § 9–103:37, at 509 (3d ed. 1985), which states, "protection of third persons in the second state is the objective." *See also General Elec. Credit Corp. v. Nardulli & Sons, Inc.,* 836 F.2d 184, 190 (3d Cir.1988).

Significantly, the secured creditor in *John Deere* (the party in General Electric's position) had asserted its rights to the col-

lateral within the four-month period. The court concluded, therefore, that filing was unnecessary "under the circumstances when all that remained was a settlement or a trial to sort out the relative priorities of the secured parties as they existed when [the bank] asserted its claims to removed collateral." 409 N.W.2d at 667.

In *In re C Tek Software, Inc.,* 117 B.R. 762, 770 (Bankr.D.N.H.1990), a bankruptcy judge in this circuit observed that when an absconding debtor and an innocent creditor in the second state are the parties, the four-month rule is literally applied. The judge explained, however, that when those factors are not present, courts consider the equities in construing the statute. *But cf. United States v. Handy & Harman,* 750 F.2d 777, 783–84 (9th Cir.1984) (citing ease of administration, court held that providing actual notice to a third party was not a sufficient substitute for refiling within four months where government filed suit to enforce interest in collateral after expiration of the period).

The *John Deere* and *C Tek* cases are consistent with the goal of the Uniform Commercial Code to provide notice of a prior security interest to creditors and other interested parties. Before section 9–103 was amended in 1972 it provided that after property was transferred to another state, a secured creditor's interest remained perfected for four months and thereafter if, within the four-month period, it was perfected in the new state. Courts concluded that the section provided protection for those who purchased collateral after expiration of the four-month period. The decisions split, however, on whether the provision protected those who purchased within four months after the property was transferred. *See International Harvester Credit Corp. v. Pefley,* 458 N.E.2d 257, 262 (Ind.Ct.App.1983); 2 White & Summers, *supra,* § 24–21, at 394.

The 1972 amendments resolved the conflict. Section 9–103(d)(i) was added to clarify that those who purchased within the four-month period were protected. "An innocent purchaser wishing to buy the collateral or a creditor contemplating an exten-

sion of credit will usually be safe if he can assure himself that the collateral has been in-state for at least four months without a filing." *Id.* at 396. The 1972 revision, however, was not intended to secure an advantage for a party with actual knowledge of the prior security interest.

BayBank, as the junior secured creditor, has no overriding equities to dislodge General Electric's priority position as to Ralar goods. As noted earlier, the bank knew about General Electric's interest from the inception of its revolving credit arrangement, was formally notified in the few weeks prior to bankruptcy and, finally, was a party to the adversary action filed by General Electric. All of these events occurred before the end of the four-month period.

Additional notice to the bank in the form of refiling within the four-month period was as unnecessary and useless an act as can be imagined. Refiling is intended to protect parties in entirely different circumstances. We see no need to apply the rule here when to do so would give an unjustified advantage to a party.[1] Such a construction of the Code would hardly be liberal, nor would it promote the Code's underlying purposes and policies.

■ On the basis of the bank's actual knowledge alone, we would be inclined to reverse the ruling of the district court and bankruptcy judge. However, there is an equally valid, if not even stronger reason, for reversal.

Section 9–403(2) of the Uniform Commercial Code provides that a financing statement is effective for five years after it is filed. Consequently, the effectiveness of a statement lapses unless the creditor files a continuation statement prior to the expiration of the five-year period. Section 9–403(2) adds, however, that "[i]f a security interest perfected by filing exists at the time insolvency proceedings are commenced by or against the debtor, the security interest remains perfected until termination of the insolvency proceedings and thereafter for a period of sixty days or until expiration of the five year period, whichever occurs later." Mass.Gen.L. ch. 106, § 9–403(2).

The bankruptcy judge declined to apply this tolling provision because it spoke only in terms of the five-year period for filing a continuation statement in the state where the property was located and did not refer to the four-month period to refile after the property is transferred from another state. He observed that even when a party fails to file a continuation statement, a creditor may still become aware of the secured interest by searching for the (lapsed) original filing. When, however, property is transferred into the state, creditors would not know where to search.

That argument is flawed for several reasons. First, as discussed earlier, BayBank had actual knowledge that the property had been in New York, and had even filed its own financing statement there. Second, the policy underlying section 9–403(2) is equally applicable to the four-month rule. The Ralar bankruptcy filing was public notice to creditors and would be purchasers.

The predecessor to section 9–403(2) did not contain an express provision tolling the period to file a continuation statement when a bankruptcy petition had been filed. Nevertheless, courts recognized that when the parties are involved in insolvency proceedings, the trustee and existing creditors gain knowledge of the perfected security interest on the date the bankruptcy petition is filed. *See In re Chaseley's Foods, Inc.*, 30 B.R. 452, 455–58 (N.D.Ind.), *aff'd in relevant part*, 726 F.2d 303 (7th Cir.1983). Consequently, filing a continuation statement served no purpose as to those parties. *Id.; In re Delia Bros.*, 29 U.C.C.Rep. 1446, 1449 (S.D.N.Y.1980); *In re South County*

---

1. For purposes of discussion, we assume that the bank qualifies as a "purchaser after removal" and that section 9–103(d)(i) applies. *See* U.C.C. § 1–201(32), (33). We note, however, that it is not clear whether BayBank advanced funds to the debtors based on goods that General Electric had sold to Ralar after its inventory was transferred to Massachusetts. This point has not been argued on appeal and, in view of our disposition of the Ralar issue, we find it unnecessary to address it.

*Motel Corp.*, 19 U.C.C.Rep. 1254, 1257 (D.R.I.1976).

In *Chaseley's Foods*, the court explained that because the trustee took open and notorious possession of the debtor's property, creditors who might obtain a lien after the financing statement expires should not need the notice provided by the filing of a continuation statement. 30 B.R. at 455.

The 1972 amendments to the Uniform Commercial Code adopted the express tolling provision for filing a continuation statement. Nevertheless, the policies behind tolling the five-year period are equally applicable beyond section 9–403(2). *See In re Phillips Const. Co.*, 579 F.2d 431, 432–33 (7th Cir.1978) (no need to bring state proceeding to enforce mechanic's lien after federal bankruptcy petition filed); *Lockhart v. Garden City Bank & Trust Co.*, 116 F.2d 658, 662 (2d Cir.1940).

The bankruptcy judge in *In re Paul*, 67 B.R. 342, 345 (Bankr.D.Mass.1986), lucidly explained the policy behind the tolling provision of section 9–403(2) and its relationship to bankruptcy proceedings. In that case, state law provided that an attachment on real estate expired after six years unless the creditor requested an extension. Noting that the bankruptcy filing "obviated any need for further notice to or protection for potential creditors by vesting all of the Debtors' property in the bankruptcy estate," the bankruptcy judge stated that "[c]ontinuation or renewal of any of the attachments after that time would be 'futile, an idle gesture, [and] ceremonial in character.'" *Id.* at 347.

In discussing the significance of the bankruptcy automatic stay, the bankruptcy judge commented, "One of the primary goals of the automatic stay is to sort out creditors into an order of priority untainted by post-petition jockeying for position." *Id.* at 345. He added that "[t]he intended effect of the stay, therefore, is to fix rights and priorities as of the time of petition filing and to prohibit any further acts to advance those rights and priorities." *Id. But cf.* 11 U.S.C. § 362(b)(3) (limited exception to automatic stay for perfecting interest in property).

Limiting section 9–403 to its explicit terms was rejected by the Court of Appeals in *Avant Petroleum, Inc. v. Banque Paribas*, 853 F.2d 140, 144 (2d Cir.1988). In that case, one of the parties to an interpleader action allowed a financing statement to lapse during the litigation. Noting that the terms of section 9–403(2) referred only to insolvency proceedings, the court said that it was "skeptical" that the drafters intended to foreclose other exceptions. "The rationale for eliminating the requirement for filing continuation statements during insolvency proceedings" is that it is not necessary for protection of creditors when the funds are in the possession and control of a court. *Id.* Thus, filing would have no more than "ceremonial effect." *Id.* at 145.

The court also observed that filing a continuation statement was not necessary to give notice to existing creditors who already had knowledge of the interpleader action. *Id.* We find the reasoning in *Avant Petroleum* to be persuasive and applicable to the case before us.

The Court of Appeals for the Third Circuit, in *General Elec. Credit Corp. v. Nardulli & Sons, Inc.*, 836 F.2d 184 (3d Cir. 1988), applied this reasoning when it was faced with a somewhat similar set of facts. There, creditors had perfected security interests in the debtor's mining equipment. After filing for bankruptcy, the debtor moved the equipment to another state and the secured creditors failed to refile in the new state within four months. The Court examined the interplay between the purpose of the four-month rule and the effects of filing for bankruptcy and stated:

"Because at the inception of the bankruptcy proceedings [the debtor] and the trustee had knowledge of the liens held by [the secured creditors], they may not avoid them simply because those creditors did not file financing statements. The filing requirements were not enacted to protect [the debtor]; they were enacted to protect future creditors or purchasers...."

*Id.* at 191.

Professors White and Summers have also suggested that filing for bankruptcy

will toll the four-month period: "Ironically, section 9–403(2) may save the secured creditor against all competitors if the debtor goes into bankruptcy within the four-month period.... Thus the debtor's bankruptcy within the four month period will have the same effect as though the [creditor] had perfected its security interest by filing in the new state." 2 White & Summers, *supra*, § 24–21, at 396. Moreover, events such as filing for bankruptcy are actually acceptable as substitutes for filing because they give notice to third parties. *Id.*

We are aware that the bankruptcy judge in *In re Utah Agricorp, Inc.*, 12 B.R. 573, 578 (Bankr.D.Utah 1981), read section 9–403 rigidly as not applicable to the four-month rule. Similarly, in *In re Ken Gardner Ford Sales, Inc.*, 41 B.R. 105, 111 (Bankr.E.D.Tenn.1984), the bankruptcy judge determined that the intervening bankruptcy did not relieve the creditors of their burden to refile within the four-month period. We, however, do not approve of the holdings in those cases.

We therefore conclude that the filing of the bankruptcy petition by Ralar tolled the period within which General Electric was required to file a financing statement in Massachusetts. Accordingly, it follows that the district court and the bankruptcy court erred in denying General Electric a priority interest because of the failure to file a financing statement within the four-month period. That ruling must be reversed.

## II.

■ The second claim that General Electric presented was that BayBank had converted the proceeds of sales made by Halmar and Ralar of General Electric products. As noted earlier, the financing arrangements made by the bank with the debtors in March 1989 required that pay-

ments made by customers would be deposited in a lockbox and turned over to the bank. In turn, the bank would lend money to Halmar that it could use to conduct its business, including paying creditors.

The bankruptcy judge's opinion does not state whether the new loans by the bank would equal the amounts taken from the lockbox, or the net amount remaining after deduction for amounts owed the bank, or whether there was any fixed correlation. In any event, the bankruptcy judge found that in the months that the BayBank arrangement was in effect, hundreds of thousands of dollars were paid in this manner to General Electric for the products it sold to Halmar.

A similar financing arrangement had existed for a number of years between Halmar and the Shawmut Bank before Bay-Bank came on the scene. Testimony at trial revealed that Shawmut also used a lockbox. Although its financing statement asserted an interest in proceeds as well as goods, General Electric did not protest the lockbox arrangement until a few days before the bankruptcy petition was filed.

The bankruptcy judge rejected the conversion claim. He concluded that by failing to place any restriction on the use of cash proceeds by Halmar, General Electric authorized general use of the funds in the ordinary course of the debtors' business. As the bankruptcy judge viewed the situation, the payments made to the bank through the lockbox were in the ordinary course of the debtors' business. Consequently, any security interest General Electric had in the proceeds expired when they passed into Baybank's hands.[2]

The bankruptcy judge also submitted several alternate bases for his decision. He concluded that General Electric's contractual relationship with the debtors created no right to control the funds, since

---

**2.** In a somewhat questionable comment, the bankruptcy judge concluded that General Electric had no security interest in the proceeds paid directly into the lockbox because they were never received by the debtors. "[T]hese proceeds were received by the Baybank in its own right and not by the debtors." But it is obvious that checks in the lockbox made payable to the debt-

ors would have to be endorsed by them to the bank as is stated in the financing arrangement. In addition, the agreement required that any checks received by Halmar or Ralar were to be sent to the lockbox. *Cf. Barber–Greene Co. v. National City Bank*, 816 F.2d 1267, 1272–73 (8th Cir.1987).

there was no provision for "in kind remittance of proceeds." Furthermore, the bank acted in good faith and, thus, in the circumstances there was no conversion. Finally, the bankruptcy judge found that General Electric was guilty of laches in failing for many years to enforce any interest in the cash proceeds against either Shawmut or BayBank.

In affirming, the district court agreed that the payment of proceeds to the bank was in the ordinary course of the debtors' business and, until making a demand on BayBank on October 13, 1989, General Electric had acquiesced in the revolving credit financing arrangement. Consequently, General Electric's security interest did not preclude payment of the proceeds to the bank in order to reduce the debtors' loan account, and such transfers did not give rise to fraudulent or unfair behavior or to the elements of conversion. The district court did not reach the issue of laches.

■ The district court cited Massachusetts law to the effect that "[l]iability for conversion arises when 'one ... intentionally and wrongfully exercises acts of ownership, control or dominion over personal property to which he has no right of possession at the time....' Nolan & Santorio, 37 *Massachusetts Practice: Tort Law*, § 55 at 65 (2d ed. 1989)." Where a defendant's possession is not wrongful in its inception, demand and refusal are prerequisites to an action for conversion. *Atlantic Fin. Corp. v. Galvam*, 311 Mass. 49, 50–51, 39 N.E.2d 951 (1942); *Abington Nat'l Bank v. Ashwood Homes, Inc.*, 19 Mass. App.Ct. 503, 475 N.E.2d 1230, 1232 (1985); W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 15, at 99 (5th ed. 1984).

On appeal, General Electric contends that to prevail it had merely to establish its right to control or possession of the proceeds and that collection through a lockbox could never be in the ordinary course of business.

In *Harley–Davidson Motor Co. v. Bank of New England—Old Colony, N.A.*, 897 F.2d 611 (1st Cir.1990), this court had the occasion to discuss the application of a conversion theory when proceeds are dis-

bursed by a debtor in the ordinary course of business. We cautioned against an excessively narrow definition of that term:

"[W]e can imagine good commercial reasons for *not* imposing, even upon sophisticated suppliers or secondary lenders, who are aware that inventory financers often take senior secured interests in 'all inventory plus proceeds,' the complicated burden of contacting these financers to secure permission to take payment from a [debtor's] ordinary commingled bank account."

*Id.* at 622. We said further, "These considerations indicate that 'ordinary course' has a fairly broad meaning;· and that a court should restrict the use of tracing rules to conduct that, in the commercial context, is rather clearly improper." *Id.*

The circumstances here differ somewhat from those in *Harley–Davidson*, nevertheless, in at least one aspect they are more definitive. Unlike that case, we have here the benefit of the bankruptcy judge's findings of fact after a trial on the merits. Our standard of review requires that we accept such findings unless they are clearly erroneous. As noted earlier, the bankruptcy judge did find affirmatively that the use of the lockbox was in the ordinary course of Halmar's business.

Even more compelling, however, are the factual findings that over the years, General Electric acquiesced in the revolving credit arrangement between Halmar and Shawmut and that it learned in September 1989 that BayBank had taken over such financing. Whatever rights General Electric, as the senior security holder, had over the bank to receipt of the proceeds, were waived by its conduct over the years. *See Neu Cheese Co. v. F.D.I.C.*, 825 F.2d 1270, 1272–73 (8th Cir.1987). The record indicates that General Electric apparently was not unhappy with existing arrangements with the bank until October of 1989. General Electric, therefore, waived its right to control the proceeds.

■ Because the proceeds were paid to BayBank in the ordinary course of business and General Electric acquiesced in the ar-

rangement, we conclude that BayBank's conduct was not wrongful at its inception. We see no reason, however, to hold that General Electric's waiver was irrevocable. *Cf.* Restatement (Second) of Torts §§ 254, 892A(5) (consent may be terminated giving rise to an action for conversion). As was noted by the district court, under Massachusetts law, demand and refusal can give rise to an action for conversion.

General Electric, after all, was the senior secured creditor and BayBank did not contact General Electric to secure its consent to the revolving credit terms. The bank's plan did exclude from the borrowing base light bulbs that General Electric supplied on consignment to the debtors.

Although General Electric's acquiescence insulated the bank from actions that occurred during the period before notice, it did not confer any right to continue that conduct indefinitely. In the letter of October 13, 1989, to BayBank, General Electric formally objected to the collection of Halmar's accounts receivable and demanded payment of the proceeds in which it had the senior security interest. This effectively terminated the period of acquiescence and restored the priorities of the security interest of the two creditors to the proceeds.[3] Consequently, further collection through the lockbox by the bank constituted conversion because General Electric had not waived its right to control these proceeds.

BayBank is therefore liable for any proceeds from Halmar sales collected through the lockbox after General Electric effectively made its demand for payment of sums due. We recognize that the demand in this case may have little practical effect because the bankruptcy court has ordered the bank to place all proceeds collected from Halmar's sales of General Electric products after September 15, 1989, in the escrow account. Nevertheless, on remand, BayBank will have to account for any proceeds from Halmar sales that occurred before September 15, 1989, collected through

the lockbox after the date of General Electric's demand.

General Electric complains that it has not received certain sums that were due it following the bankruptcy court's order pertaining to inventory received after September 15, 1989. It also contends that it was entitled to all proceeds collected within ten days prior to the filing of the bankruptcy petition regardless of when the sales took place. Those matters are not properly before us and should be brought before the bankruptcy court on remand in light of this opinion.

Accordingly, the judgment of the district court will be reversed insofar as it pertains to the General Electric loss of priority interest in goods covered by the Ralar financing statement. The matter is remanded to the district court for further proceedings consistent with this opinion.

---

**3.** We note that the bankruptcy judge's reliance on laches as a further basis to deny the conversion claim does not affect our conclusion. While he was concerned with the equity of allowing General Electric to now hold BayBank liable for *all proceeds* collected since it began using the lockbox, our rationale does not result in such inequity.