971 So.2d 302 (2007)
FIRST NATIONAL BANK OF PICAYUNE
v.
PEARL RIVER FABRICATORS, INC.
No. 2006-CC-2195.
Supreme Court of Louisiana.
November 16, 2007.
Rehearing Denied January 7, 2008.
*304 Adams and Reese, Thomas Eliot Gottsegen, Martin A. Stern, New Orleans, Patricia Barry McMurray, Baton Rouge, Raymond Peter Ward, New Orleans, for applicant.
Liskow & Lewis, George Denegre, Jr., Katherine Seegers Roth, Thomas E. Schafer, III, Shannon Skelton Holtzman, New Orleans, Miller & Williamson, Ira M. Williamson, for respondent.
Reginald James Laurent, New Orleans, for amicus curiae, E.H. Mitchell & Co., LLC.
KNOLL, Justice.
The difficult issue before us concerns our secured transaction laws pertaining to perfection of a security interest in collateral in one state and the failure to timely re-perfect the security interest in the collateral when the collateral is subsequently sold and moved to Louisiana. This troubling issue presented from these facts is res nova. Simply stately, the issue to be decided concerns the legal consequences which arise when the secured creditor does not re-perfect its security interest within a year after the transfer as required by LA. REV.STAT. ANN. ง 10:9-316, infra. After resolving issues of mootness and appellate procedure, we affirm the decision of the Court of Appeal, First Circuit, which found the secured creditor's security interest lapsed because of its failure to timely reperfect its security interest in Louisiana.

FACTS
On December 11, 2000, Pearl River Fabricators, Inc. (Pearl River), a Mississippi business corporation with its principal office located in Picayune, Mississippi, borrowed $200,000 from the First National Bank of Picayune (FNB). To secure the loan, Pearl River executed a security agreement in favor of FNB, identifying certain collateral, including a "90 foot cutter head dredge" and a "sand and gravel shaker plant." On July 24, 2001, FNB filed and recorded a UCC-1 financing statement with the Chancery Clerk for Pearl River County, Mississippi, detailing its security interest in the above-described property.
The security agreement between Pearl River and FNB prohibited Pearl River from transferring "any of the collateral to any third party without the prior written consent of" FNB. Notwithstanding, on November 23, 2001, Pearl River, without notifying FNB, sold several pieces of equipment, including the cutter head dredge and the shaker plant it had at its Picayune, Mississippi plant, to Growth Fund Industries, *305 Inc. (GFI), a for-profit domestic corporation created on October 5, 2001, in Indiana. Pearl River financed the equipment sale to GFI. In its agreement with Pearl River, GFI made a down payment of $45,000 and agreed to pay the remaining balance ($453,000) in sixty-one monthly installments. GFI never took physical possession of the equipment.
On December 11, 2001, GFI sold the cutter head and shaker plant to Phoenix Associates Land Syndicate, Inc. (Phoenix), a Nevada business corporation with its principal office in Madisonville, Louisiana. In the agreement among these parties, Phoenix agreed to pay GFI a $45,000 down payment and to pay the balance without interest as follows: 60 payments of $7,500, 1 payment of $3,000 and 1 balloon payment of $1,468,999.95.[1] On January 9, 2002, GFI filed a UCC-1 financing statement with the Louisiana Secretary of State and the Clerk of Court for St. Tammany Parish, identifying it as the secured party and Phoenix as the debtor. The financing statement identified the secured property, in part, as including a "90' X 22' X 5' Dredge Completely Powered" and "(1) 6' X 16'โDeck Shaker W/Standard Washbox." In May 2002, the equipment Phoenix acquired from GFI was transported by Pearl River from its principal office in Picayune, Mississippi to Phoenix's principal office in Madisonville, Louisiana.
On November 17, 2003, FNB filed a Louisiana UCC-1 financing statement with the St. Tammany Parish Clerk of Court. The financing statement identified FNB as the secured party and Pearl River as the debtor. The collateral was identified, in part, as "One (1) 90' ื 22' ื 5' Dredge completely powered, [and] One (1) 6' ื 16' 3 deck shaker plant with stand and washbox."
On January 13, 2004, after Pearl River defaulted on its loan obligation, FNB filed its petition for executory process and sequestration against Pearl River in St. Tammany Parish. FNB requested sequestration of the collateral which secured Pearl River's obligation to it, alleged that the collateral was now located in St. Tammany Parish, and requested notice to Phoenix or GFI as a third-party possessor of the collateral. Pursuant to FNB's request, the trial court issued a writ of sequestration for the dredge and the deck shaker with stand and washbox. It further ordered that the equipment be "seized and subsequently . . . sold according to law to the bidder with appraisal."
On March 11, 2004, Phoenix filed a motion to dissolve FNB's writ of sequestration and further sought damages from FNB for the wrongful issuance of the writ of sequestration.[2] Phoenix alleged that the property Pearl River provided as collateral for its loan from FNB was not the same equipment Phoenix purchased from GFI. Phoenix further alleged FNB did not have a security interest in the sequestered equipment because it failed to file its financing statement in Louisiana within one year of the date the collateral was transferred from Mississippi to Louisiana.
On May 3, 2004, the trial court denied Phoenix's motion to dissolve the writ of *306 sequestration and its request for damages. It found the property Pearl River collateralized for its loan from FNB and the equipment Phoenix purchased from GFI was one and the same. The trial court further rejected Phoenix's contention that it was necessary for FNB to refile its UCC-1 financing statement in Louisiana within one year, finding FNB/Pearl River's security agreement perfected in Mississippi was valid and enforceable in Louisiana.
Following issuance of the trial court judgment, Phoenix filed a supervisory writ application with the Court of Appeal, First Circuit. Noting that intervention was the appropriate procedural vehicle under LA. CODE CIV. PROC. ANN. art. 3509[3] for a third-party possessor to dissolve a writ of sequestration, and that Phoenix's writ application contained no documentation of its status before the trial court, the appellate court declined to consider the writ application.[4]First National Bank of Picayune v. Pearl River Fabricators, Inc., 2004 CW 1102 (La.App. 1 Cir. 6/1/04) (unpublished).
Thereafter, Phoenix devolutively appealed from the trial court judgment, denying its motion to dissolve the writ of sequestration and for damages.[5] In response to Phoenix's appeal, FNB filed a peremptory exception of no right of action and a motion to summarily dismiss the appeal, contending Phoenix had no standing to appeal because it had failed to intervene in the lawsuit.
Relying on its decision in Spiers v. Roye, 04-2189 (La.App. 1 Cir. 5/19/06), 927 So.2d 1158, a five-judge panel of the appellate court recognized that a judgment denying a motion to dissolve a writ of sequestration coupled with a demand for damages is a nonappealable interlocutory judgment. It further found Phoenix was not entitled to appeal this interlocutory judgment on the basis that it may cause irreparable injury. Accordingly, the appellate court concluded Phoenix was not entitled to appeal the trial court judgment. Nevertheless, pursuant to LA.CODE CIV. PROC. ANN. art. 2164 (an "appellate court shall render any judgment which is just, legal, and proper upon the record on appeal"), the appellate court, with two judges dissenting, denied FNB's peremptory exception of no right of action, converted Phoenix's appeal to a writ application and considered the issues raised therein.
*307 In a split decision,[6] a five-judge panel of the appellate court granted Phoenix's writ application and reversed the trial court's judgment. On the merits, the appellate court held FNB failed to re-perfect its security interest in the property within one year of the transfer of the equipment, causing its security interest to become unperfected. Accordingly, the appellate court reversed the trial court judgment and remanded the case to the trial court to consider Phoenix's damage request for the wrongful issuance of the writ of sequestration.
We granted FNB's writ application to this Court. First National Bank of Picayune v. Pearl River Fabricators, Inc., 2006-CC-2195 (La.2/16/07), 949 So.2d 416. Foremost among our reasons for granting FNB's writ application was to consider whether Phoenix's knowledge about the situs of its purchased property at the time of the sale from GFI and the delivery of that property from Mississippi to Phoenix's office in Louisiana should have defeated Phoenix's claim that FNB failed to timely re-perfect its security interest after Pearl River's collateralized property was moved to Louisiana. In addition to that question, issues were raised at oral argument of whether the sheriff's sale of the movable property prior to Phoenix's appeal rendered this case moot and whether the appellate court had jurisdiction to consider Phoenix's assignments of error.

MOOTNESS
It was brought to our attention at oral argument that the sequestered property had been advertized and sold before Phoenix devolutively appealed the trial court judgment. The question then becomes whether this matter is moot, should not have been considered in the appellate court, and is not properly before us.
The jurisprudence of this Court is well settled that courts will not decide abstract, hypothetical or moot controversies, or render advisory opinions with respect to such controversies. Cat's Meow, Inc. v. City of New Orleans Through Dept. of Finance, 98-0601 (La.10/20/98), 720 So.2d 1186, 1193. In order to avoid deciding abstract, hypothetical or moot questions, courts require cases submitted for adjudication to be justiciable, ripe for decision, and not brought prematurely. St. Charles Parish Sch. Bd. v. GAF Corp., 512 So.2d 1165 (La.1987).
This traditional notion of a "justiciable controversy" is rooted in our Constitution's tripartite distribution of powers into the executive, legislative, and judicial branches of government. LA. CONST. ANN. art. II, ง 1. According to Louisiana jurisprudence, an issue is "moot" when a judgment or decree on that issue has been "deprived of practical significance" or "made abstract or purely academic." Perschall v. State, 96-0322 (La.7/1/97), 697 So.2d 240; Louisiana Associated Gen. Contractors, Inc., 95-2105 (La.3/8/96), 669 So.2d 1185, 1193; American Waste & Pollution Control Co., 627 So.2d 158, 162 (La. 1993). A case is "moot" when a rendered judgment or decree can serve no useful purpose and give no practical relief or effect. Robin v. Concerned Citizens for Better Educ. in St. Bernard, Inc., 384 *308 So.2d 405 (La.1980). If the case is moot, then "`there is no subject matter on which the judgment of the court can operate.'" St. Charles Parish Sch. Bd., 512 So.2d at 1171 (citing Ex parte Baez, 177 U.S. 378, 20 S.Ct. 673, 44 L.Ed. 813, (1900)). That is, jurisdiction, once established, may abate if the case becomes moot. Cat's Meow, Inc., 720 So.2d at 1193. Notwithstanding, we have held that "[a]lthough the primary subject of a dispute has become moot, the controversy is not moot if there are collateral consequences to one of the parties." Cats Meow, 720 So.2d at 1197.
In the present case, we do not find that the sale of the sequestered property rendered this matter moot. Although the sale of the property rendered moot that portion of Phoenix's motion to dissolve the writ of sequestration, the propriety of FNB's sequestration may nonetheless be reviewed to determine whether there was any merit to the second aspect of Phoenix's motion, namely, a request for the award of damages should it be determined the writ of sequestration was improvidently issued.

APPELLATE COURT JURISDICTION
We must next determine whether the appellate court, which had first rejected Phoenix's writ application because it was not a party to the litigation, correctly concluded Phoenix was properly before it. If the appellate court erred in finding Phoenix was properly before it, it then follows that we likewise have no authority to entertain the arguments raised in this matter.
FNB contends that because Phoenix failed to intervene to assert its claim of ownership under LA.CODE CIV. PROC. ANN. art. 1092, or seek to recover the enhanced value of its property due to improvements Phoenix made, LA.CODE CIV. PROC. ANN. art. 2703(3), or seek the release of the property by furnishing security pursuant to LA.CODE CIV. PROC. ANN. arts. 3508 and 3509, Phoenix was limited under LA.CODE CIV. PROC. ANN. art. 2703(2) to arrest the seizure and sale on the ground that FNB failed to perfect its security interest in either Louisiana or Mississippi, see LA.CODE CIV. PROC. ANN. art. 2751. FNB argues Phoenix failed to timely perfect its appeal until after the seizure and sale had been accomplished. Accordingly, FNB asserts Phoenix was not properly before the appellate court and the reviewing court erred when it entertained Phoenix's arguments.
Phoenix asserts it was properly before both the trial court and appellate court under LA.CODE CIV. PROC. ANN. art. 3506 that allows a defendant to obtain the dissolution of a writ of sequestration by motion. It argues that although it was not formally made a defendant in FNB's petition for executory process and sequestration, the pleadings identified Phoenix as a third-party possessor and it was served with FNB's petition. Phoenix further contends it had a right to intervene and its motion to dissolve sequestration and for damages constituted an intervention under well-settled Louisiana jurisprudence that disfavors harsh rules of pleading. Further, Phoenix points out LA.CODE CIV. PROC. ANN. arts. 3508 and 3509 are irrelevant because those articles address a third-party possessor's right to secure release of the seized property upon furnishing security. Phoenix contends that although it could have pursued release of the sequestered property, it chose another remedy available to it.
It is well settled in Louisiana that "rules of procedure implement the substantive law and are not an end in themselves." LA.CODE CIV. PROC. ANN. art. 5051. "Each pleading must be reasonably construed so as to afford the litigant his day in court, arrive at the truth, and do substantial justice." Succession of Smith, 247 *309 La. 921, 175 So.2d 269, 271 (La.1965); Budget Plan of Baton Rouge, Inc. v. Talbert, 276 So.2d 297 (La.1973) (quoting Succession of Smith).
Against that backdrop, LA.CODE CIV. PROC. ANN. art. 3506 provides:
The defendant by contradictory motion may obtain the dissolution of a writ of attachment or of sequestration, unless the plaintiff proves the grounds upon which the writ was issued. If the writ of attachment or of sequestration is dissolved, the action shall then proceed as if no writ had been issued.
The court may allow damages for the wrongful issuance of a writ of attachment or of sequestration on a motion to dissolve, or on a reconventional demand. Attorney's fees for the services rendered in connection with the dissolution of the writ may be included as an element of damages whether the writ is dissolved on motion or after trial on the merits.
We find Phoenix's contention meritorious that its motion to dissolve constituted an intervention. As reflected in the record, Phoenix's pleading alleged its ownership of the sequestered property, urged that its property was different from that to which FNB claimed a security interest, contended FNB failed to properly perfect its security interest with regard to Pearl River, and prayed for the dissolution of the writ of sequestration and the award of damages for wrongful seizure of its property. The record further shows Phoenix requested service of its pleading on FNB and that FNB filed a memorandum on the merits in opposition to Phoenix's motion prior to hearing the contradictory motion in the trial court. At no time did FNB object to Phoenix's use of this procedure to seek the dissolution of the writ of sequestration. Relying on this state's jurisprudence to construe pleadings to do substantial justice, we find Phoenix's pleading constituted an intervention and its contradictory motion was a proper procedural vehicle under LA.CODE CIV. PROC. ANN. art. 3506 to urge the dissolution of the writ of sequestration and to seek damages.
In making this determination, we find no merit to FNB's contention that only the "defendant-debtor" can seek dissolution and damages under LA.CODE CIV. PROC. ANN. art. 3506 for the wrongful sequestration through a motion. The language of Article 3506 does not limit its application to a "defendant-debtor." This conforms with the provision of LA.CODE CIV. PROC. ANN. art. 1092 that, "A third person claiming ownership of, or a mortgage or privilege on, property seized may assert his claim by intervention. If the third person asserts ownership of the seized property, the intervention may be filed at any time prior to the judicial sale of the seized property,. . . ." It is noteworthy that intervention under art. 1092 is permissive, not mandatory. Moreover, this Court has recognized that even an intervenor who was dismissed from an attachment suit, may file a separate suit for damages for the wrongful seizure of its property. See Meyers v. Berotte, 41 La. Ann. 745, 6 So. 607 (1889); see also L.D. Brinkman & Co. v. C & J Carpets, Inc., 392 So.2d 174, 176 (La.App. 4 Cir.1980), writ denied, 397 So.2d 1363 (La.1981) (holding that even though an insurer was not a party defendant, it had a right to seek dissolution of a writ of attachment).[7] *310 Clearly, in its pleadings in the trial court before the judicial sale of the sequestered property, Phoenix not only asserted its third-party ownership of the sequestered property, but urged that FNB's security interest was no longer enforceable and thus the writ of sequestration would have been wrongfully issued for that reason.
LA. CONST. ANN. art. V, ง 10(A) provides that "a court of appeal has appellate jurisdiction of . . . all civil matters,. . . .". The Constitution further provides that an appellate court has "supervisory jurisdiction over cases which arise within its circuit." Id. Without reaching the conflict among the circuit courts of appeal on whether an appeal or a supervisory writ was the proper procedure for Phoenix to follow in seeking review of the trial court's denial of its motion to dissolve FNB's writ of sequestration and its request for damages,[8] we find Phoenix was properly before the lower courts and the parties are correctly before us.

DISCUSSION
FNB contends Phoenix should be charged with knowledge of the bank's security interest because it purchased equipment which, at the time of the sale, was located in Pearl River County, Mississippi, where the security interest was perfected and was a matter of public record. FNB further argues LA.REV.STAT. ANN. ง 10:9-316 and its re-perfection requirements are inapplicable because that statute and its re-perfection procedure only apply to a purchase or other transfer occurring in the destination state, after the collateral has been moved there.
Phoenix urges that FNB's position rests upon a knowledge requirement not found in LA.REV.STAT. ANN. ง 10:9-316 as reflected in the Legislature's recodification in 2001 and the deletion of the words, "after removal," from former LA.REV.STAT. ANN. ง 10:9-103(1)(d)(i). It argues that utilizing well established Louisiana principles of statutory construction, this Court should interpret LA.REV.STAT. ANN. ง 10:9-316 as written, without a gloss that would either interject a knowledge requirement that does not exist or a limitation that the transfer must occur in the destination state after the collateral has been moved there. Phoenix contends that a plain reading of LA.REV.STAT. ANN. ง 10:9-316 compels the conclusion that FNB's security interest lapsed. Phoenix points out that although FNB admits it became aware of the transfer of the property on which it had a security interest in December 2002, it did not re-file its financing statement until November 17, 2003. Accordingly, Phoenix contends FNB's lack of due diligence should not be rewarded.
Before examining the legal issues presented, we find a review of the record facts beneficial to place the parties' arguments into perspective. The record reveals only brief elaboration on the knowledge each party possessed about the existence of a security interest and the movement of the collateralized property to Louisiana. Nonetheless, we find the record facts are sufficient to provide a background for our discussion of the issues.
At the hearing on Phoenix's motion to dissolve the sequestration, Jerry T. Craft, *311 Jr., the owner of Pearl River, testified his company built the equipment at issue in this case. He admitted the property was subject to a security interest in favor of FNB, that Pearl River transferred its interest in the equipment to GFI, that he never informed FNB of the sale of the equipment that secured its indebtedness as required by the contract it had with FNB, and that Pearl River delivered the equipment from Mississippi to Phoenix's Louisiana plant in the spring of 2002.
Counsel for FNB also referenced a stipulation among the parties that the equipment was located in Pearl River County, Mississippi at the time Pearl River granted FNB a security interest in the equipment. The record further evidences that the various parties attempted to settle their differences on December 18, 2002, but failed.
Phoenix's president, Paul Alonzo, testified he entered into discussions with Craft in 1998 or 1999 about building a dredge for Phoenix. Alonzo also testified he purchased the dredge and shaker box from GFI, not Pearl River. He stated GFI agreed to finance the equipment Phoenix was buying. At that time, he stated he received 10% of GFI stock and gave Steve Blackburn, the president of GFI, and Ron Blackburn Phoenix stock. As of November 21, 2001, the Blackburns were on the Phoenix board of directors, but the same was not true with regard to Alonzo and GFI. Alonzo testified he was aware GFI was selling Phoenix the same dredge and appurtenances identified in the November 23, 2001 correspondence in which GFI purchased the equipment from Pearl River. Although Alonzo never specifically testified where the equipment was located at the time of Phoenix's purchase, he acknowledged delivery of the equipment by Pearl River to Phoenix's Louisiana plant.
FNB contends Phoenix purchased its (FNB's) collateral in Mississippi and removed it to Louisiana several months later.[9] FNB argues that if the purchase occurred in Mississippi, such purchase would have been subject to its recorded security interest in the equipment and no re-perfection was required.
The initial question thus presented is whether Phoenix purchased the equipment from GFI in Mississippi, where the equipment was located, or Indiana, where GFI was domiciled and where the purchase documents initiated. As defined in the UCC, "purchase includes taking by sale,. . . ." UCC ง 1-201(32). Similarly, a purchaser "means a person who takes by purchase." Under UCC ง 2-106, a "sale" consists in the passing of title from the seller to the buyer for a price. In the present case, it is clear that although the equipment GFI sold to Phoenix may have been located in Mississippi, the purchase documents were generated by GFI from its Indiana headquarters. As shown in the prior sale by Pearl River, title to the equipment passed to GFI on November 23, 2001. It was this title to the equipment GFI transferred to Phoenix on December 11, 2001. Thus, we find no merit to FNB's contention that Phoenix's purchase from GFI occurred in Mississippi.
*312 The statute in question, LA.REV.STAT. ANN. ง 10:9-316, provides, in pertinent part:
(a) General rule: effect on perfection of change in governing law. A security interest perfected pursuant to the law of the jurisdiction designated in R.S. 10:9-301(1) or 9-305(c) remains perfected until the earliest of:
(1) the time perfection would have ceased under the law of that jurisdiction;
(2) the expiration of four months after a change of the debtor's location to another jurisdiction; or
(3) the expiration of one year after a transfer of collateral to a person that thereby becomes a debtor and is located in another jurisdiction.
(b) Security interest perfected or unperfected under law of new jurisdiction. If a security interest described in subsection (a) becomes perfected under the law of the other jurisdiction before the earliest time or event described in that subsection, it remains perfected thereafter. If the security interest does not become perfected under the law of the other jurisdiction before the earliest time or event, it becomes unperfected and is deemed never to have been perfected as against a purchaser of the collateral for value.
FNB first urges this Court to give LA.REV.STAT. ANN. ง 10:9-316(3) its plain meaning. It contends the retroactive lapse rule did not come into play because there was no transfer of the property after it entered into Louisiana. In making this assertion, FNB argues that the re-perfection required in LA.REV.STAT. ANN. ง 10:9-316(3) is only triggered where there is a "transfer" of property to a person "located in another jurisdiction." It points out that the word "transfer" does not simply refer to physical movement of property across state lines. Instead, relying upon THOMAS A. HARRELL, A GUIDE TO THE PROVISIONS OF CHAPTER NINE OF LOUISIANA'S COMMERCIAL CODE, 50 LA. L.REV. 711, 474 (1990) for a definition of the word transfer,[10] FNB contends that because the property never changed ownership after it was moved to Louisiana, the one-year period was not triggered, and its security interest was never unperfected.
Phoenix points out that FNB's argument in this regard may have been viable under former LA.REV.STAT. ANN. ง 10:9-103(1)(d)(i) which contained the words, "after removal." However, it contends the re-codification of LA.REV.STAT. ANN. ง 10:9-103(1)(d)(i) as LA.REV.STAT. ANN. ง 10:9-316(b) reflects a change of the law, and it further points out it is undisputed Pearl River's transfer to GFI and GFI's transfer to Phoenix occurred after the re-codification. It argues that the deletion of the words, "after removal," formerly contained in LA.REV.STAT. ANN. ง 10:9-103(1)(d)(i) strips FNB's assertion of any statutory basis.
The function of statutory interpretation and the construction to be given to legislative acts rests with the judicial branch of the government. Theriot v. Midland Risk Ins. Co., 95-2895 (La.5/20/97), 694 So.2d 184, 186. The rules of statutory construction are designed to ascertain and enforce the intent of the legislature. Succession of Boyter, 99-0761 (La.1/7/00), 756 So.2d 1122, 1128; State v. Piazza, 596 So.2d 817, 819 (La.1992). Legislation is the solemn expression of *313 legislative will and, thus, the interpretation of legislation is primarily the search for the legislative intent. Boyter, 756 So.2d at 1128; Cat's Meow, Inc. v. City of New Orleans through Dep't of Fin., 98-0601 (La.10/20/98), 720 So.2d 1186, 1198. We have often noted the paramount consideration in statutory interpretation is ascertainment of the legislative intent and the reason or reasons which prompted the legislature to enact the law. State v. Johnson, 03-2993 (La.10/19/04), 884 So.2d 568, 575; Theriot, 694 So.2d at 186.
The starting point in the interpretation of any statute is the language of the statute itself. Johnson, 884 So.2d at 575; Theriot, 694 So.2d at 186. "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." LA. CIV.CODE ANN. art. 9; Johnson, 884 So.2d at 575. However, "when the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law." LA. CIV.CODE ANN. art. 10; Fontenot v. Reddell Vidrine Water Dist., 02-0439,(La.1/14/03), 836 So.2d 14, 20. Moreover, "when the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole." LA. CIV.CODE ANN. art. 12.
It is also well established that the Legislature is presumed to enact each statute with deliberation and with full knowledge of all existing laws on the same subject. Johnson, 884 So.2d at 576; State v. Campbell, 03-3035 (La.7/6/04), 877 So.2d 112, 117. Thus, legislative language will be interpreted on the assumption that the Legislature was aware of existing statutes, well established principles of statutory construction and with knowledge of the effect of their acts and a purpose in view. Johnson, 884 So.2d at 576-77; Campbell, 877 So.2d at 117.
Prior to 2001, the principle of continued perfection of security interests in multi-state transactions was codified in LA.REV. STAT. ANN. ง 10:9-103(1)(d)(i). It provided, in pertinent part:
[I]f the action is not taken before expiration of the period of perfection in the other jurisdiction or the end of four months after the collateral is brought into this state, whichever period first expires, the security interest becomes unperfected at the end of that period and is thereafter deemed to have been unperfected as against a person who became a purchaser after removal. . . .
(Emphasis added).
After July 1, 2001, LA.REV.STAT. ANN. ง 10:9-103(1)(d)(i) was re-codified as LA. REV.STAT. ANN. ง 10:9-316(b) and re-worded[11] as follows:
(b) Security interest perfected or unperfected under law of new jurisdiction. If a security interest described in subsection (a) becomes perfected under the law of the other jurisdiction before the earliest time or event described in that subsection, it remains perfected thereafter. If the security interest does not become perfected under the law of the other jurisdiction before the earliest time or event, it becomes unperfected and is deemed never to have been perfected as *314 against a purchaser of the collateral for value.

(Emphasis added).
Considering the wording of LA.REV.STAT. ANN. ง 10:9-316(b) and the failure of the Legislature to carry forward the words "after removal" formerly contained in LA. REV.STAT. ANN. ง 10:9-103(1)(d)(i), we find no merit to FNB's contention that the re-perfection rules do not apply, because Phoenix did not purchase the equipment after it had been moved to this jurisdiction.[12] To find otherwise would require us to ignore the wording of LA.REV.STAT. ANN. ง 10:9-316(b) and call for the interjection of language not contained in the statute. Clearly, Phoenix was a purchaser located in a jurisdiction other than Mississippi, i.e., Nevada, the state where it was organized, see LA.REV.STAT. ANN. ง 10:9-307(e) ("A registered organization that is organized under the law of a State is located in that State."), and there was a transfer of title ownership to Phoenix through GFI's sale to it.
The next issue before us involves the question of the proper interpretation to be given to the UCC provisions applicable to the retroactive lapse rule. FNB contends these provisions should be interpreted liberally and applied to the underlying purposes and policies. LA.REV.STAT. ANN. ง 10:1-103. In that light, FNB next urges us to adopt language included in comments on the retroactive lapse rule and common law jurisprudence that treats purchasers with notice of the underlying security interest differently from those without such notice. To the contrary, Phoenix contends that when presented with competing interpretation of the UCC, the laws must be applied as written, free of any gloss that common law jurisdictions may have added through the comments to the articles and their interpretive jurisprudence.
LA.REV.STAT. ANN. ง 10:1-102(1) provides that the provisions of Title 10, Commercial Laws, "shall be liberally construed and applied to promote its purposes and policies." The purposes and policies of Title 10 are:
(a) to simplify, clarify and modernize the law governing commercial transactions;
(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;
(c) to promote uniformity of the law among the various jurisdictions.
LA.REV.STAT. ANN. ง 10:1-102(2). Although LA.REV.STAT. ANN. ง 10:1-102(3) provides that the effects of Title 10 may be varied by agreement, "the meaning of the statute in question itself must be found in its text, including its definitions, and in appropriate extrinsic aids." Uniform Commercial Code Comment, LA.REV.STAT. ANN. ง 10:1-102, Comment 2. In addition, we have recognized that, although not binding on this Court, the comments to a code article represent an extrinsic aid that assists in statutory interpretation. Aetna Ins. Co. v. Naquin, 488 So.2d 950, n. 5 at 954-55 (La.1986); Terrebonne Parish School Bd. v. Castex Energy, Inc., 04-0968 (La.1/19/05), 893 So.2d 789, 797; see also Willis-Knighton Medical Center v. Caddo Shreveport Sales and Use Tax Com'n, 04-0473 (La.4/1/05), 903 So.2d 1071, 1087. Moreover, notwithstanding the well established *315 principle that Louisiana's civilian tradition does not recognize stare decisis as an authoritative source of law, see Doerr v. Mobil Oil Corp., 00-0947 (La.12/19/00), 774 So.2d 119, 128-29,[13] this Court has stated that in deciding novel issues under the UCC, "we are authorized to consider the manner in which the courts of our sister states have decided such cases." Cromwell v. Commerce & Energy Bank of Lafayette, 464 So.2d 721, 730 (La. 1985).
FNB posits its twofold argument as follows: (1) it points to the Uniform Commercial Code Comment to LA.REV.STAT. ANN. ง 10:9-316; and (2) cites to three cases, Alpine Paper Co. v. Lontz, 856 S.W.2d 940 (Mo.Ct.App.1993); In re Halmar Distributors, Inc., 968 F.2d 121 (1st Cir.1992); and General Electric Credit Corp. v. Nardulli & Sons, Inc., 836 F.2d 184 (3d Cir.1988).
FNB references language in Example 6 of the Comments which states, "Buyer took subject to Lender's perfected security interest, of which Buyer was unaware . . . Having given value and received delivery of the equipment without knowledge of the security interest and before it was perfected [in the new jurisdiction], Buyer would take free of the security interest." (Emphasis added). Premised on that language, FNB urges that the official commentary to LA.REV.STAT. ANN. ง 10:9-316 recognizes a distinction between purchasers who already have notice of the underlying security interest perfected in another jurisdiction and those without such notice. Relying upon that language, FNB argues that creditors and purchasers who are already on notice of an underlying security interest do not require the protection of being re-notified vis-เ-vis re-perfection of the security agreement in the new jurisdiction.
Phoenix counters with the assertion that nothing in the text of LA.REV.STAT. ANN. ง 10:9-316 supports FNB's position that งง 10:9-316(a) and (b) are only applicable when a third-party purchaser lacks knowledge of the pre-existing security interest. Thus, it concludes that when the express language of LA.REV.STAT. ANN. ง 10:9-316 does not contain the qualifying words "without knowledge," it is improper for the courts to supply such a qualification.
"When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." LA. CIV.CODE ANN. art. 9; Johnson, 884 So.2d at 575. In the present case, the Legislature did not qualify LA. REV.STAT. ANN. ง 10:9-316 to entities without knowledge of pre-existing security interests. Furthermore, as stated in LA. REV.STAT. ANN. ง 10:1-201(25), "[a] person `knows' or has `knowledge' of a fact when he has actual knowledge of it." FNB has not made a showing that Phoenix knew or had knowledge of the recorded Mississippi security agreement, only that the equipment was located in Mississippi at the time *316 of its purchase from GFI.[14]
Moreover, we further observe that Example 6 of the Uniform Commercial Code Comments references Section 9-317(b) when it states that those without knowledge of a security interest will take free of the security interest if delivery is made before perfection of the security interest. LA.REV.STAT. ANN. ง 10:9-317(b) provides:
(b) Buyers that receive delivery. Except as otherwise provided in subsection (e), a buyer, other than a secured party, of tangible chattel paper, documents, goods, instruments, or a security certificate takes free of a security interest or agricultural lien if the buyer gives value and receives delivery of the collateral before it is perfected.
In the 2001 Louisiana Official Revision Comments to LA.REV.STAT. ANN. ง 10:9-317, the following is stated:
This section is uniform with revised U.C.C. Article 9, except that in subsections (b), (c) and (d) the requirement of being "without knowledge" has been deleted. This change is consistent with the Louisiana public records doctrine, which is predicated on filing and not knowledge. The Louisiana rule is that actual knowledge by third parties of an unrecorded interest is immaterial; proper filing is alone dispositive. McDuffie v. Walker, 125 La. 152, 51 So. 100, 105 (La.1909); Dallas v. Farrington, 490 So.2d 265, 269 (La.1986); F.D.I.C. v. McFarland, 243 F.3d 876 (5th Cir.2001); R.S. 9:2721; see also Nathan & Dunbar, "The Collateral Mortgage: Logic and Experience", 49 La. L.Rev. 39, 44 n. 22 (1988); Hargrave, "Presumptions and Burdens of Proof in Louisiana Property Law", 46 La. L.Rev. 225, 234 (1985). This change also promotes judicial efficiency by facilitating proof in contested cases.
(Emphasis added).
Referencing the comments to LA.REV. STAT. ANN. ง 10:9-316 and the cross-reference therein to LA.REV.STAT. ANN. ง 10:9-317, we find further support for Phoenix's assertion that the plain language of LA. REV.STAT. ANN. ง 10:9-316 is dispositive of the issue presented. In conformity with the Louisiana rule which strongly adheres to the Louisiana public records doctrine, we find no support for FNB's reliance on the comments to LA.REV.STAT. ANN. ง 10:9-316. Moreover, at no time does FNB contend Phoenix had actual knowledge of FNB's recorded security agreement in Mississippi; it simply asserts Phoenix received shipment of the equipment from Mississippi. This fact alone does not meet the requirements of LA.REV.STAT. ANN. ง 10:1-201(25).
Finally, although FNB relies upon Alpine Paper Co. v. Lontz, 856 S.W.2d 940 (Mo.Ct.App.1993); In re Halmar Distributors, Inc., 968 F.2d 121 (1st Cir.1992); and General Electric Credit Corp. v. Nardulli & Sons, Inc., 836 F.2d 184 (3d Cir.1988), we find these cases inapposite to the present factual scenario. A close reading of Alpine shows it distinguishable because there "the ultimate question [was] whether PAI and Lontz were `purchasers after removal' [under R.S. Mo. ง 9-103]." As we found above, the 2001 revision did not codify the term "purchasers after removal" in revised and re-enacted LA.REV.STAT. *317 ANN. ง 10:9-316. Nardulli is also distinguishable because it involved the original debtor and creditor and did not implicate the effect a third-party purchaser might have had on the resolution of the issues presented. Lastly, Halmar may be distinguished on two grounds: (1) unlike the present case, the holding was premised on UCC 9-403(2), a proviso adopted in Massachusetts providing that the filing of a bankruptcy petition by the third party purchaser tolled the period within which re-perfection of the financing statement was required; and (2) the junior competing creditor was provided actual notice of the senior creditor's financing agreement before the end of the period required within which the senior creditor had to re-perfect its security agreement.

CONCLUSION
After conducting this statutory analysis of the rules relative to re-perfection, we realize the impact this holding has on lenders.[15] Nonetheless, our ruling today effectuates the principles the Legislature adopted with regard to the rules relative to the re-perfection of security agreements. As the record shows in the case sub judice, FNB failed to re-perfect its security interest prior to the lapse of the one-year period delineated in LA.REV. STAT. ANN. ง 10:9-316.[16] Pursuant to LA. REV.STAT. ANN. ง 10:9-316(b), FNB's failure to timely re-perfect its security interest in Louisiana prior to the lapse of its security interest resulted in its security interest becoming unperfected and deemed never to have been perfected against Phoenix.

DECREE
For the foregoing reasons, the judgment of the Court of Appeals, First Circuit, is affirmed. This matter is remanded to the trial court for consideration of Phoenix's request for damages for wrongful sequestration.
AFFIRMED AND REMANDED TO THE TRIAL COURT.
*318 JOHNSON, J., dissents for reasons assigned by TRAYLOR, J.
TRAYLOR, J., dissents and assigns reasons.
WEIMER, J., concurs and assigns reasons.
TRAYLOR, Justice, dissenting.
The majority opinion finds that Phoenix is not procedurally barred from dissolving the writ of sequestration, even though it did not intervene, by relying on La. C.C.P. art. 3506, which allows a defendant, to obtain the dissolution of a writ of sequestration by motion. Because Phoenix was a third-party possessor with a right to intervene, and because it filed a motion, the proposed opinion finds that its motion to dissolve constituted an intervention as a party defendant. I disagree.
The procedural articles relevant to a third-party possessor's rights when a writ of sequestration is filed are as follows. La. C.C.P. art. 1092, entitled "Third person asserting ownership of, or mortgage or privilege on, seized property" provides in pertinent part:
A third person claiming ownership of, or a mortgage or privilege on, property seized may assert his claim by intervention. If the third party asserts ownership of the seized property, the intervention may be filed at any time prior to the judicial sale of the seized property, and the court may grant him injunctive relief to prevent such sale before an adjudication of his claim of ownership.
In this case, Phoenix was served with notice of the suit as a third-party possessor. Phoenix claims that although it could have intervened, it chose to file a motion to dissolve the writ of sequestration instead. La. C.C.P. art. 3506, on which Phoenix and the majority opinion rely, provides:
The defendant by contradictory motion may obtain the dissolution of a writ of attachment or of sequestration, unless the plaintiff proves the grounds upon which the writ was issued. If the writ of attachment or of sequestration is dissolved, the action shall then proceed as if no writ had been issued.
The court may allow damages for the wrongful issuance of a writ of attachment or of sequestration on a motion to dissolve, or on a reconventional demand . . . (Emphasis added)
Phoenix was not a defendant, thus it was not entitled to obtain the dissolution of the writ by motion. Further, La. C.C.P. art. 3509 provides "[w]hen property seized under a writ of attachment or of sequestration is in the possession of one not a party to the action, he may intervene in the action and, upon prima facie showing that he is the owner . . . have the property released by furnishing security in the manner and amount, within the same delay, and with the same effect as a defendant." Again, La. C.C.P. art. 3509 reinforces the requirements of La. C.C.P. art. 1092 that a non-party possessor of the property must intervene to have the property released.
Finally, La. C.C.P. art. 2703 defines the rights of a third-party possessor as follows:
When property sold or otherwise alienated by the original debtor of his legal successor has been seized and is about to be sold under executory process, a person who has acquired the property subject to the mortgage or privilege thereon and who has not assumed the payment of the indebtedness secured thereby may:
(1) Pay the balance due on the indebtedness, in principal, interest, attorney's fees, and costs;

*319 (2) Arrest the seizure and sale on any of the grounds mentioned in Article 2751,[1] or on the ground that the mortgage or privilege was not recorded, or that the inscription of the recordation thereof had perempted; or,
(3) Intervene in the executory proceeding to assert any claim which he has to the enhanced value of the property due to improvements placed on the property by him, or by any prior third possessor through whom he claims ownership of the property. This intervention shall be a summary proceeding initiated by a petition complying with Article 891.
By filing a motion to dissolve the writ of sequestration, Phoenix did not follow any of these procedures either. Thus, Phoenix did not proceed according to any of the procedural avenues available to it. As Phoenix is not a defendant, it is not entitled to have the writ dissolved by motion under La. C.C.P. art. 3506.
I find puzzling the fact that, after the court of appeal first declined to consider Phoenix's writ application, apparently finding that Phoenix had no standing because it had not intervened in the matter, Phoenix was then allowed to file a devolutive appeal. The court of appeal, after finding that a judgment denying a motion to dissolve a writ of sequestration and for damages is a nonappealable interlocutory judgment, then converted the appeal back to a writ application. Inexplicably, the court of appeal then granted the writ and found in favor of Phoenix on the merits, when the appellate court had declined to consider basically the same filing on the ground that Phoenix lacked standing.
While the standing issue is important in and of itself, standing also relates to the issue of mootness. The only issue which the majority opinion claims remains after the sale of the property is Phoenix's request for damages if the court determines the writ of sequestration was improvidently issued. Since I believe Phoenix was not properly in the suit, and this is an issue raised by Phoenix as a non-party, then this issue was not properly before the court of appeal.
Because the majority opinion incorrectly decides the procedural question raised, I respectfully dissent.
WEIMER, J., concurring.
I concur in the majority opinion.
Relative to the procedural posture of this case, I find that whether Phoenix intervened or moved to have the writ of sequestration dissolved is of no moment. Based on LSA-C.C.P. art.2086,[1] Phoenix was not required to do either, but can nevertheless appeal an unfavorable decision by the district court. Thus, I find any extensive discussion of the alleged procedural problem unnecessary. As noted by the majority in a footnote, and by the court of appeal, LSA-C.C.P. art. 3509[2] *320 provides that the possessor of seized property may intervene, and LSA-C.C.P. art. 2086 permits a party who could have intervened to appeal. These two articles, read together, are dispositive of the issue raised by FNB regarding the propriety of an appeal by Phoenix. It is clear that Phoenix could have appealed the judgment of the trial court, which allowed the sequestration and the subsequent sale of the seized equipment, even if Phoenix had filed no pleadings in the trial court. The fact that Phoenix filed a motion to dissolve the writ of sequestration instead of filing a petition of intervention is immaterial; such a filing does not bar Phoenix from exercising its Article 2086 right to appeal. Because Phoenix could appeal if it did nothing, the fact Phoenix filed an injunction and became involved in the litigation does not adversely affect its right to appeal.
NOTES
[1] Despite the greatly differing sales prices, an examination of the sales agreements shows GFI sold nothing more to Phoenix than it received in the sale from Pearl River. The sole difference in the sale price is the final balloon payment Phoenix agreed to make to GFI.
[2] Nothing in the present record indicates that GFI has asserted the priority of the security interest it filed on January 9, 2002. The record further shows nothing about the status of any action FNB may have attempted to collect the underlying debt of Pearl River. See n. 16, infra at 25.
[3] LA.CODE CIV. PROC. ANN. art. 3509 provides:

When property seized under a writ of attachment or of sequestration is in the possession of one not a party to the action, he may intervene in the action and, upon prima facie showing that he is the owner, pledgee, or consignee of the property, have the property released by furnishing security in the manner and amount, within the same delay, and with the same effect as a defendant.
[4] The ruling of the First Circuit stated:

WRIT NOT CONSIDERED. The appropriate vehicle for a possessor to seek dissolution of a writ of sequestration is by intervention. La. C.C.P. art. 3509. The writ application contains no documentation of relator's status before the court.
Supplementation of this writ application and/or an application for rehearing will not be considered. Rules 4-9 and 2-18.7, Uniform Rules of Louisiana Courts of Appeal.
In the event relator seeks to file a new application with this Court, it must contain all pertinent documentation showing the original writ application was timely filed and must comply with Rule 2-12.2, Uniform Rules of Louisiana Courts of Appeal, effective January 1, 2002. Any new application must be filed on or before June 15, 2004, and must contain a copy of this ruling.
[5] The parties stated at oral argument that pending Phoenix's devolutive appeal, the sequestered property was advertized and sold. See infra for discussion of the question of mootness.
[6] Only one judge unconditionally signed the plurality opinion; two judges concurred without reasons; one judge agreed, in part, that the judgment of the trial court was not appealable, but disagreed with the decision to exercise the appellate court's supervisory jurisdiction and further agreed with the other dissenting judge's reasons on the merits of the case; another judge dissented on the ground that the appellate court had no subject matter jurisdiction over a non-party who could not appeal the interlocutory judgment and further dissented on the merits.
[7] Moreover, LA.CODE CIV. PROC. ANN. art.2086 provides: "A person who could have intervened in the trial court may appeal, whether or not any other appeal has been taken." When LA.CODE CIV. PROC. ANN. art. 3509, supra at n. 3, is read in pari materia with art.2086, it is clear Phoenix could have appealed the trial court's judgment even if it had filed no pleading in the trial court. Because Phoenix filed various pleadings in the trial court, we find that fact enhances, not diminishes, its right to appeal.
[8] Although the Court of Appeal, First Circuit, identified a conflict among the circuits on this question, there is no need for us to address this issue at this time. The appellate court, either exercising its appellate or supervisory jurisdiction, properly reached the merits of Phoenix's argument.
[9] It is clear this was not a Louisiana sale. In Borne v. Alexander Hardwood Co., 140 La. 315, 72 So. 979 (La.1916) the question arose as to whether the Louisiana vendor's lien applied in a multi-state sale. In that instance, as evidenced in a written instrument, a corporation domiciled in Michigan sold personal property situated in Tennessee to a corporation domiciled in Louisiana; later, the property was delivered from Tennessee to a representative of the purchaser in Louisiana. Under those facts, this court concluded the sale was not governed by the laws of Louisiana, but by the common law. The same is applicable here.
[10] As presented in the law review article, a transfer "encompasses any form of successor or the creation of any real right in or over the thing," including "a transfer of ownership by agreement or involuntarily." THOMAS A. HARRELL, A GUIDE TO THE PROVISIONS OF CHAPTER NINE OF LOUISIANA'S COMMERCIAL CODE, 50 LA. L.REV. 711.
[11] Though not applicable in the present case, it is noted that the 2001 revision further extended the period within which the creditor has to re-perfect its security agreement in the new jurisdiction. Whereas that period was four months under LA.REV.STAT. ANN. ง 10:9-103(1)(d)(i), that period was extended to one year in LA.REV.STAT. ANN. ง 10:9-316(a)(3).
[12] In making this determination, we save for another day the question of whether the one-year period for re-perfection is triggered by the date of the transfer of ownership or by the date the collateral is moved to another jurisdiction. The facts of this case show FNB attempted to re-perfect its security interest in the equipment well past either triggering event.
[13] Under the civilian tradition, while a single decision is not binding on our courts, when a series of decisions form a "constant stream of uniform and homogenous rulings having the same reasoning," jurisprudence constante applies and operates with "considerable persuasive authority." JAMES L. DENNIS, INTERPRETATION AND APPLICATION OF THE CIVIL CODE AND THE EVALUATION OF JUDICIAL PRECEDENT, 54 LA. L.REV. 1, 15 (1993). Because of the fact that "one of the fundamental rules of [the civil law tradition] is that a tribunal is never bound by the decisions which it formerly rendered: it can always change its mind," 1 MARCEL PLANIOL, TREATISE ON THE CIVIL LAW ง 123, (La. State Law Inst. trans.1959) (12th ed.1939), prior holdings by this court are persuasive, not authoritative, expressions of the law. See A.N. YIANNOPOULOS, LOUISIANA CIVIL LAW SYSTEM ง 35, p. 53, 54 (1977).
[14] Although FNB asserts that the UCC "imposes an obligation of good faith in its performance and enforcement," LA.REV.STAT. ANN. ง 10:1-304, the record is devoid of evidence that Phoenix's purchase was made in bad faith. As a practical matter Phoenix further points out, "No reasonable purchaser for value would knowingly pay the purchase price for the collateral subject to an existing security interest and move it out-of-state based on the hope that the lender will not re-file within one year." Def's Surreply Brief at 2.
[15] We note the following statement David Willenzik makes in LOUISIANA SECURED TRANSACTIONS about the relocation of goods rule, an analogous provision to that applicable to the equipment Phoenix acquired, which requires re-perfection of a security interest in goods within four-months of the relocation of the goods:

The Four-Month Relocation Rule is a harsh rule. There are no excuses for a lender not refiling in the other state within four months of the relocation of the goods . . . even when the lender does not know that the goods have been moved. A lender may not depend on the borrower to advise the lender when secured goods are moved to another state for more than four months. Even if the borrower contractually agrees to advise the lender should this occur, and for some reason the borrower fails to do so, the lender must refile in the new state within four months. A lender has the responsibility to be aware of the borrower's activities at all times.
DAVID S. WILLENZIK, LOUISIANA SECURED TRANSACTIONS ง 6:54 at p. 266 (West 2007). Such observation is equally applicable to the transfer of equipment to Phoenix at issue in the present case. As Willenzik further points out, "UCC Article 9 requires a secured lender to police the collateral and to know when goods are moved to another state." Id.
[16] Inexplicably, the record also shows FNB failed to promptly re-perfect even after it became aware of the equipment's transfer and relocation to Louisiana. See FNB's supplemental memorandum in support of its rule to show cause which recites the following undisputed facts:

[FNB] was not aware of the purchase agreements between Pearl River, [GFI], and Phoenix until on or about the Settlement Agreement in December 2002. At that time, the dredge and shaker plant had been in St. Tammany Parish for some eight months.
Trial tr. vol. I, 91 (May 26, 2004).
FNB did not file its Louisiana UCC-1 financing statement until November 17, 2003.
[1] La. C.C. art. 2751 provides that "the defendant in the executory proceeding may arrest the seizure and sale of the property by injunction when the debt secured by the security interest, mortgage, or privilege is extinguished, or is legally unenforceable, or if the procedure required by law for an executory proceeding has not been followed."
[1] Article 2086 is entitled, "Right of third person to appeal," and provides: "A person who could have intervened in the trial court may appeal, whether or not any other appeal has been taken."
[2] Article 3509 is entitled, "Release of property by third person," and provides:

When property seized under a writ of attachment or of sequestration is in the possession of one not a party to the action, he may intervene in the action and, upon prima facie showing that he is the owner, pledge, or consignee of the property, have the property released by furnishing security in the manner and amount, within the same delay, and with the same effect as a defendant.